**In re PRUSSIA ASSOCIATES, a Pennsylvania Limited Partnership, Debtor.**

No. 04–11042 SR.

United States Bankruptcy Court, E.D. Pennsylvania.

April 5, 2005.

Martin J. Weis, Esquire, Lawrence McMichael, Esquire, Jennifer L. Maleski, Esquire, Dilworth Paxon, Philadelphia, PA, for Debtor.

Richard B. DiFrischia, Esquire, William S. Coulson, Pittsburgh, PA, Dennis J. O'Brien, Esquire, Pittsburgh, PA, George Conway, Esquire, Office Of The U.S. Trustee, Myron Bloom, Esquire, Hangley, Aronchick, Segal & Pudlin, Nicole Marie Nigrelli, Esquire, Klehr, Harrison, Harvey, Braneburg, Ellers, Gretchen M. Santamour, Esquire, Wolf, Block, Schorr and Solis Cohen LLP, Philadelphia, PA, for Fremont Investment & Loan.

### OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

Before the Court are three contested matters. In the first, the Chapter 11 Debtor, Prussia Associates, a Pennsylvania Limited Partnership (the "Debtor" or "Prussia Associates") requests confirmation of a proposed plan of reorganization. (Exhibit D–1) This request is vigorously opposed by the Debtor's principal secured creditor, Fremont Investment and Loan ("Fremont"), which has initiated the other two contested matters, the first of which is a motion entitled Motion for Appointment of Chapter 11 Trustee and Court Approved Sale of the Real Property/Conversion to Chapter 7 Case/or Relief from Stay, and the second of which is entitled Motion to Replace Existing Management Company.[1] The latter two motions were filed contemporaneously with the filing of Fremont's objections to the Debtor's plan of reorganization, but were held over by agreement for a consolidated hearing with the request for plan confirmation. Combined evidentiary hearings were held January 27, 2005, February 7, 2005, and February 14, 2005. Afterward, on March 3, 2005, the parties filed written submissions in support of their respective positions. For the reasons which follow, confirmation of the plan will be denied, as will both motions of Fremont. However, given the Court's conclusion that the Debtor's plan is not beyond reformation such as might render it confirmable, the Court will afford the Debtor an opportunity to amend the plan. If the Debtor is unwilling or unable to do so, the Court will consider conversion or dismissal of the case. To ascertain the Debtor's intentions, the Court will hold a status conference thirty days from the date of the Order which accompanies this Opinion.

### Background.

There are numerous issues in dispute between the parties, and many facts rele-

---

1. Several other objections to the proposed reorganized plan were filed, but all were resolved prior to the confirmation hearing and/or are resolved subject to confirmation of the proposed plan.

vant thereto. As a consequence, a somewhat detailed exposition of the issues and the case history is necessitated.

The Debtor is a Pennsylvania limited partnership that owns and operates a hotel known as the Valley Forge Hilton, located at 251 DeKalb Pike, King of Prussia, PA, 19406. The hotel is a nine story building, with 348 rooms, situate on a site of approximately 9.5 acres. It is a "full service" hotel, which is to say that in addition to guest rooms, the hotel also has on-site restaurant, event, and conference/meeting facilities.

The hotel was constructed and began operating in 1971. In 1983 King of Prussia Enterprises, Inc., the original owner, conveyed the property to the present owner, Prussia Associates. Both the original and the present owner are entities owned and/or controlled by an individual named Martin W. Field. The present ownership structure is as follows: Prussia Associates is a Pennsylvania Limited Partnership; its general partner is Prussia Hotel Inc.; the corporate general partner is wholly owned by Martin Field and this corporation owns a 1% general partnership interest in Prussia Associates; the remaining 99% of the ownership interests in the Debtor are limited partnership interests which are collectively owned by the Field Family Trust (49%), the Field Family Trust 2(49%) and Kathleen P. Field (Martin's spouse—1%).[2]

This is Prussia Associates' second Chapter 11 bankruptcy case. Its first case was filed in December 1992. In the first case a reorganization plan was confirmed on September 24, 1993.

Fremont is the Debtor's principal secured creditor. The parties' relationship is based on a loan in the amount of $17,500,000. The loan was made on December 11, 2000 and was for the purpose of refinancing existing indebtedness. It is secured by a first mortgage on the hotel and was originally intended to be a short term "bridge" loan repayable in two years. By agreement, the maturity date was extended from January 1, 2003 to July 1, 2003. The underlying promissory note provides for a variable rate of interest that can fluctuate between a floor of 8% and ceiling of 16.97%. Payments to Fremont ceased in March 2003, and the entirety of the principal balance is outstanding.[3]

The Debtor attributes its repayment default to certain specific factors. First, the Debtor points to the fact that in June 2003, its franchisor, Hilton Hotels, Inc., required it to undertake an extensive property improvements program that included renovations to guest rooms, corridors, ballrooms, meeting spaces, the building facade, and miscellaneous mechanical systems. Failure to perform the renovations might have resulted in cancellation of the Hotel's franchise. The renovations were undertaken at a cost in excess of $1,000,000 and are now completed or in the final stages of completion. The Debtor stresses, however, that during the renovation period as many as forty guest rooms were rendered unavailable for rent, with an obvious adverse impact on revenues. The Debtor

**2.** The Valley Forge Hilton is one of six hotels owned by entities which themselves are owned and/or controlled by Mr. Field. Two of the other hotels are in jointly administered Chapter 11 cases pending before this Court; to wit: LaGuardia Associates, L.P. (Docket 04–34512) the owner and operator of a Crown Plaza hotel near LaGuardia Airport in New York, and Field Hotel Associates, L.P. (Docket 04–34514) the owner and operator of the Holiday Inn JFK near New York's JFK airport.

**3.** The Court notes that the most recent cash collateral agreement between the parties calls for the commencement of adequate protection payments of $91,238.19 per month beginning with the month of April, 2005.

next emphasizes that at roughly the same time that it was compelled to undertake renovations, a major reconstruction project was underway on the highway upon which the hotel fronts. (Pennsylvania Route 202) The road construction project, says the Debtor, adversely impacted occupancy. Finally, the Debtor notes that the hotel industry, in general, suffered a downturn in business in the aftermath of the events of September 11, 2001.

Reasons aside, based upon the Debtor's default, a judgment by confession in the amount of $18,247,638.91 was entered against it by Fremont on September 5, 2003. A sheriff's sale was scheduled for January 28, 2004, but was averted on January 26, 2004 by the commencement of this bankruptcy case. Fremont has filed a proof of claim herein in the amount of $18,676,583.41 which, it says, represents the judgment debt, plus interest at 6% (the legal rate in Pennsylvania) from the date of the entry of the judgment to the petition date of the Bankruptcy case.

The Debtor agrees that its obligation to Fremont is approximately $19,000,000. In addition to this, the Debtor's estimated liabilities include a secured tax claim of $220,098.95, unsecured priority tax claims of $400,000 and general unsecured claims of $5,515,000. The Debtor's general unsecured claims include a scheduled claim in the amount of $493,164.58 owed to an entity called Grand Pacific Finance Corp. ("Grand Pacific") This obligation represents the remaining balance owed under a $3,000,000 "mezzanine" loan to the Debtor made in or about December of the year 2000. Loan documentation incident to the Grand Pacific mezzanine loan expressly subordinates repayment of that loan to

Fremont's loan, which is to say that no payments of principal and/or interest were to be made to Grand Pacific until Fremont had been paid in full.

Both the Fremont and Grand Pacific loans are subject to guarantee agreements. Specifically, Martin Field has individually guaranteed the prompt payment of interest on the Fremont debt, and the Field Family Trust has guaranteed the prompt repayment of both the principal and interest components of the Fremont debt.[4] Mr. Field, the Field Family Trust 2, and (perhaps, though it unclear from the record) Mrs. Field also guaranteed repayment of the entirety of the Grand Pacific loan. There were pledges of partnership interests also given by the Fields in connection with the Grand Pacific debt.

The provisions of the Grand Pacific loan documents notwithstanding, it is undisputed that substantial repayment of the Grand Pacific debt has occurred. Approximately $162,000 in periodic payments was remitted directly by the Debtor over a period of years. (See Fremont Exhibit—5) In addition, a lump sum payment of $2,000,000 was repaid on June 11, 2003 from the proceeds of a refinance of the JFK Holiday Inn (See Footnote No. 2 supra)

The hotels owned and/or controlled by Mr. Field are operated by an entity called New Penn Management Co., Inc., pursuant to a written management agreement dated January 17, 1995. New Penn is wholly owned by Mr. Field, who is also its president and sole director. In conjunction with the Fremont loan transaction, Prussia Associates assigned to Fremont all of its rights under the management agree-

4. On September 5, 2004, Fremont entered judgment by confession against the Field Family Trust in the amount of $18,-247.638.91, and on September 19, 2003, Fre-

mont separately entered judgment by confession against Martin Field in the amount of $769,996.03.

ment with New Penn. (See Exhibit B to Exhibit F–1).

Since the inception of the case, the Debtor has continued operations as a Debtor in Possession under consensual agreements between itself and Fremont for the use of cash collateral.

The Debtor's plan of reorganization was filed on September 17, 2004. The plan, in the words of Debtor's counsel, is "fairly straightforward." (T—1/27 at 12)[5] The Debtor proposes to pay all of its debts in full. *Id.* Technically speaking, this observation is accurate. It is disingenuous, however, for counsel to imply from this that the situation is non-complex. Indeed, there are numerous and significant challenges to the plan interposed by Fremont. These will be examined in turn against the requirements of Bankruptcy Code § 1129(b)(1), but first will follow a description of the plan.

There are, in total, 11 classes of claims and interests provided for in the Debtor's plan. The full 11, however, do not require extensive analysis. Instead, the relevant terms of the plan, for present purposes, may be summarized as follows:

The Debtor proposes to pay secured and priority tax claims in full on the effective date of the plan, which is to be April 1, 2005, unless extended by A) agreement between the Debtor and Fremont, or B) Order of Court.

General unsecured creditors are to receive promissory notes payable over three years, at 6% interest, for the allowed amounts of their claims or, at their option, a 50% cash payment on the Plan's effective date.

There is a separate class of claims called "Affiliate Unsecured Claims." The term affiliate is used here as it is defined in bankruptcy code section 101(2). The Debtor describes this class as consisting of individuals who or entities which have a relationship of ownership to the Debtor. According to the Debtor, these individuals and entities would include Holiday Inn/ City Line; Holiday Inn Express; Holiday Inn, JFK Airport; Field Family Trust; Crown Plaza/LaGuardia Airport; Guest Transportation Services; Martin W. Field; Joseph B. Selig; and Joseph Field. The plan provides for affiliated unsecured claimants to receive a "cash flow" promissory note, at 6% interest, on the effective date of the plan. The notes will provide for interest only payments to be made if 1) the Fremont debt is current, 2) the Debtor is not in default of its obligations to Hilton Hotels, and 3) the Debtor is otherwise in compliance with the terms of its plan. Subject to the same conditions, and following the second anniversary of the effective date of the plan, repayments of principal may also be made to the noteholders at any time and in any amount.

The Debtor's general and limited partners retain their interests under the plan, with no requirement for the infusion of fresh capital, or "new value" on their part.

Fremont retains its liens under the plan, however its debt is recast. For the first year Fremont is to be paid interest only, in monthly installments, at the rate of 6.5%. Thereafter, Fremont is to receive monthly principal and interest payments, with the interest rate remaining at 6.5%, and the principal component being based on a 25 year amortization. A "balloon" payment of all outstanding principal and interest is due on the 7 year anniversary of the plan's effective date. Under the plan, "Fremont

---

**5.** ("T" or Transcript references refer to the hearings held on January 27, 2005, February 7, 2005 and February 14, 2005)

shall not have the right to enforce its claim against any party other than the reorganized debtor, including any guarantor or surety relating to the claim, unless and until the reorganized partnership has failed to perform its obligations under the plan in relation to Fremont." (Exhibit D–1 at 8).

The Debtor's report of plan voting (Exhibit D–4) reflects no votes received from security and priority tax claimants. General unsecured creditors accepted the plan by a vote of 91% in number and 91% in amount. 100% of affiliated unsecured creditors voted to accept the plan. According to the report of plan voting, affiliate creditors hold $650,810 in claims.

Fremont, of course, has voted to reject the plan. Its objections are numerous, but center generally on two complaints; to wit: feasibility and fairness. Insofar as feasibility goes, Fremont argues that if the plan is confirmed the Debtor will be unable to fund both its operations and its plan obligations. In making this argument, Fremont points to both the Debtor's substantial historic losses and its performance in this case. It also asserts 1) that the Debtor's future income projections are overly optimistic; 2) that its estimate of the reserve necessary for future capital expenditures is too low; 3) that is management is incompetent, untrustworthy, and overpaid; and 4) that its projected cash needs are understated, because under applicable bankruptcy law the interest rate on the recast Fremont debt must be higher than that contemplated under the plan.

Fremont further maintains that the plan cannot be confirmed under the "cramdown" provisions of 11 U.S.C. § 1129(b)(1) because it is neither fair nor equitable, and because it unfairly discriminates against Fremont. On this score, Fremont emphasizes the provisions of the plan which permit the entirety of all affiliate unsecured claims to be repaid ahead of Fremont, the lack of an equity infusion by ownership, the injunction in favor of Fremont's guarantors, and the inadequacy of the proposed interest rate.

The Debtor, in contrast, defends its plan against all of Fremont's objections. Insofar as feasibility goes, the Debtor argues 1) that its income and expense projections are reasonable in all respects and predicated on valid assumptions; 2) that incumbent management is honest, fairly paid, and best suited to continue to operate the Debtor; and 3) that the interest rate proposed for Fremont's recast loan is, in fact, higher than that mandated under applicable law.

As to fairness, the Debtor notes that Fremont is the only objector to its plan, and argues 1) that the provisions of the plan, including the proposed interest rate for Fremont, comply with Bankruptcy Code § 1129(b)(2)(A)(i)(II); 2) that under such circumstances there is neither any requirement for an infusion of capital by partners who are to retain their partnership interest, nor is there anything improper about the provisions of the plan which allow prior payments to affiliate creditors; and 3) that appropriate circumstances exist to justify those provisions of the plan which non-consensually enjoin actions against third parties prior to the maturity date of the recast Fremont loan.

If there is anything obvious from the above, it is that Prussia Associates and Fremont agree on little. Oddly enough, however, they agree on one question which is frequently in heated dispute in a contested confirmation hearing; to wit: whether Fremont's interest in the subject collateral; i.e., the hotel, is oversecured or undersecured. On this score, there is agreement that Fremont is oversecured. The agreement, however, ends there, as the parties are sharply divided over the

value of the hotel, and hence, the size of any "equity cushion." This issue is of significance, as it bears on the risk factors attendant to the Debtor's plan. These, in turn, have relevance to the determination of the appropriate interest rate to be used in measuring the value of the proposed plan payments to Fremont against the requirements of the Bankruptcy Code's "cramdown" section. The value of the hotel, of course, also has a bearing on the issues raised in the two motions which Fremont has pending. The Court's analysis of the parties' many competing positions will, accordingly, begin with this important question.

### Discussion

#### Valuation

■ To cut to the heart of the matter, the Court finds the value of the Valley Forge Hilton as of February 14, 2005 to be $23,000,000. In reaching this conclusion the Court has carefully considered the entirety of the evidence on point. In general, the Court agrees that the Debtor's appraiser has taken a somewhat overly optimistic view of the Hotel's income generating potential and that Fremont's appraisal presents a more realistic assessment thereof. Conversely, the Court finds that Fremont's appraisal fails to give sufficient weight to what both appraisers agree is an extremely strong market for hotel transactions, while the Debtor's appraisal does. As a result, the Court's valuation is a function of combining Fremont's income based value with an adjustment for market driven appreciation.

The value of the Valley Forge Hilton is certainly among the most difficult questions presented herein. Ironically, this follows because each side, despite using the same (accepted) methodology, adduced credible expert appraisal testimony relevant to the question, yet the conclusions of the two well qualified experts vary considerably. The explanation for this lies in the fact that there are certain strengths and weaknesses to be found in each appraisal.

The Debtor's appraisal, by the firm of Cushman and Wakefield, values the hotel at $26 million as of January 1, 2005. Fremont's appraisal, by the firm of HVS International, places the value of the property at $21.2 million as of September 2, 2004.[6] Each appraisal is supported by a lengthy written report, and extensive testimony was elicited from each appraiser on February 14, 2005. The sum of the evidence well illustrates the oft noted proposition that the appraisal of real estate is an inexact science.[7]

There are three widely acknowledged approaches to the valuation of real estate. Both appraisers agreed that the methodology most appropriate for present purposes was a discounted cash flow analysis. Each appraiser noted, but disregarded entirely, the alternative of a replacement cost analysis, but each used the third method, i.e., the sales comparison approach, secondarily, as a cross-check to test the validity of their assumptions and the opinion of value reached using the discounted cash flow approach.

The discounted cash flow analysis assumes the sale of a property to a buyer who holds it for a period of years, typically ten years, and then sells it. The buyer receives the benefit of 10 years net income and the sales proceeds at the end of the

---

**6.** HVS actually stated the realty's value as $20.9 million, net of $317,000 in real estate tax liens. The parties agree this reduction should be added back for purposes of an even up comparison of the two appraisals.

**7.** Even Mr. Field agrees with that. (See T— 1/27 at 113–114)

term. To calculate the fair market value of the property, a number of assumptions must be made by the appraiser. The appraiser must, for instance, identify two interest rates; to wit: the interest at which the stream of annual income will be discounted to present value (the "discount rate") and a terminal capitalization rate, which is used in calculating the assumed sales price at the end of the holding period. Beyond this, the appraiser must, of course, project the expected annual net income during the holding period years. These projections, in turn, necessitate many other assumptions on the part of the appraiser. In projecting annual income it is clear that the "devil is in the details," as the appraiser must make assumptions concerning, inter alia, industry trends, demographics, regional economics, local market competition, historical operating results as predictive of future performance, the present and future condition of the property and, given that it is assumed that a hypothetical buyer will finance a part of the purchase price, the loan to value ratio at which the buyer can anticipate borrowing funds.

The appraiser's ultimate conclusion as to value is the product of a series of correlations, in that the brighter the picture looks after evaluation of the above factors, the higher will be the projected annual net income. The higher the appraiser's projected annual income, the lower will be the discount rate. The lower the appraiser's chosen discount rate is, the higher, generally, will be the appraiser's estimate of value.

There can be no question that the parties' appraisers were both extremely thorough in the performance of their assignments. They each took into consideration all relevant factors. In point of fact, their differences of opinion were in some respects slight. Each appraiser, for instance, used the same terminal capitalization rate (11%), and each assumed the same average room rate for use in calculating future income. Fremont's appraiser actually used a slightly more bullish discount rate (12.5%) than the Debtor's appraiser (13%). The lower discount rate would indicate that Fremont's appraiser attached a lower degree of risk to its income projections. As noted, a lower discount rate typically produces a higher valuation. Nevertheless, Fremont's property valuation is lower than the Debtor's. This is because the two appraisers differ rather sharply in their projections of future net income. In this respect, Suzanne Mellen of HVS projects lower future income than Daniel Lesser of Cushman and Wakefield. The assumptions which account for their differences of opinion are numerous.

In rendering her opinion, Ms. Mellen, for example, placed significantly more weight on the Debtor's historically poor operating results. (T—2/14 at 90) In this regard, it is undisputed that the hotel has sustained book losses in excess of $10 million from 1999 through 2003, while earning modest annual net income over the same period. The Debtor has seemingly turned the corner, and Ms. Mellen does not expect a reversal. She simply does not think that things will improve as dramatically or as quickly as Mr. Lesser does.

In this respect, Ms. Mellen projects that the Debtor will achieve a stabilized occupancy rate of 65% in four years, based on 98% market penetration. This, she predicts, will in turn produce a doubling of present net income to $2.5 million per year. (T—2/14 at 93) Mr. Lesser, in contrast, foresees the Debtor achieving a stabilized occupancy rate of 68% in three years time, with 110% market penetration, and resultant annual net income at that time of $3 million. In reaching his opinion, Mr. Lesser acknowledges the past, but

believes, more so than Ms. Mellen, that the Debtor's poor performance has been chiefly attributable to the renovations, the highway project and the industry falloff after September 11, 2001. With these issues behind it, Mr. Lesser believes that the Debtor will achieve the profitability that he projects in the time he estimates.

Ms. Mellen's income projections, and her ultimate opinion of value, are more conservative than Mr. Lesser's for several other reasons. For one, she notes that the Debtor was performing poorly well before the events of September 11, 2001. She also notes that the Debtor's franchise with Hilton Hotels, unless extended, expires in the year 2010. The loss of the franchise would clearly have a negative effect on value. (T—2/14 at 24) Ms. Mellen further points out that the proposal to refinance the hotel contemplates the retention of New Penn Management. In her view, this could depress the price at which the hotel would change hands, because the hotel is not an "institutional" quality facility, but is rather one more likely to appeal to an owner/operator type of purchaser. (T—2/14 at 94, 127, 182–185) Ms. Mellen also believes that in the current market a purchaser could anticipate financing 65% of the purchase price, (T—2/14 at 94–96), whereas Mr. Lesser believes 70% to 80% financing could be found. (T—2/14 at 29) A smaller degree of leverage normally tends to depress the price investors are willing to pay for a hotel. Finally, Ms. Mellen has reservations about the ability of the Debtor to achieve more than the revenues she forecasts in light of the re-opening of a fully renovated hotel in direct proximity to it. (T—2/14 at 89).

Of significance, Ms. Mellen's income projections also reflect a 5% reserve for capital expenditures versus 4% on the part of Mr. Lesser. A reserve, of course, depresses net income. The parties disagree on the industry norm, and the evidence on this point is difficult to reconcile. That aside, Ms. Mellen believes that 5% is appropriate, given that the hotel is 35 years old and has what she characterizes as incurable functional obsolescence. Moreover, many of the recent renovations, she maintains, were not for one time capital items with long replacement lives, but actually represented deferred maintenance. (T—2/14 at 181–183) Mr. Lesser disagrees with this, and emphasizes that, in total, approximately $7 million has been invested into the property in recent years. He believes that this number is so large as to justify a 4% reserve going forward. (T—2/14 at 19).

In "cross checking" their income based valuations against the comparable sales approach, the appraisers again clashed. Both agree that the market for hotel properties is very good right now, and that the Valley Forge Hilton would sell in as little as six months if marketed without duress. Each appraiser, however, challenges the legitimacy of the alleged "comparable" sales the other has selected. Their areas of disagreement in this respect are so numerous as to somewhat impede review. Suffice it to say that each side disagrees that the other has contrasted the value of the subject property with sales of truly comparable properties. Their complaints extend to the location of the properties, the age of the properties, the dates of the sales, and the historic operating performances of the properties.

In the opinion of the Court, the totality of the evidence on this point, ironically, almost neutralized itself, in that each side lost about the same number of points as it won. As a consequence, the evidence relative to *individual* comparable sales was not particularly helpful. That being the case, it is just as well that comparable sales was not the principal indicator of

value relied upon by either appraiser. Rather, as noted above, both appraisers instead relied primarily on their valuation estimates as predicated upon projected future cash flows. Unfortunately, and as discussed above, something of the same dilemma besets the parties' income based valuations, because many of the questions over which they disagree involve pure judgment calls. Ideally, it might have been useful for the parties to have adopted the procedure sometimes used in eminent domain or tax assessment proceedings, where the appraisers of two parties select a third appraiser to provide an independent third party valuation. That, of course, is not practicable at this juncture and the Court must determine the value of the property based on the evidence before it.

As previously noted, the appraisal of realty is an inexact science. Having reiterated this maxim, the Court concludes that the value of the hotel lies towards the lower end of the two estimates before it. At bottom, the Court's rationale, just as the Debtor's reorganization plan, is fairly straightforward; it finds the assumptions made by HVS in reaching its future income projections to be in almost every respect sounder than those employed by Cushman & Wakefield. The Court, accordingly, finds that, measured strictly on a discounted cash flow basis, the value of the hotel is no greater than that estimated by HVS; to wit: $21.2 million. The question, however, does not end here. The Court notes that both parties are in emphatic agreement as to the present strength of the hotel sales market. (T—2/14 at 91, 172) In this respect, Cushman and Wake-

field estimates that the value of the property based on the sales comparison approach could be as high as $28 million.[8] The president of HVS, meanwhile, has opined that the value of hotels in the Philadelphia region is increasing annually at a rate in excess of 20%. He predicts this trend to continue through the year 2006. (T—2/14 at 102, 103) This factor gives some weight to the Debtor's criticism of the HVS appraisal (as of 9–2–04) as being outdated. While Ms. Mellon of HVS is no doubt correct that robust regional trends do not necessarily guarantee that any one particular property will experience appreciation, when the trends are so significant one is reminded of the adage that a rising tide tends to lift all boats.[9] Put differently, the Court, finds that a meaningful upward adjustment in value is warranted, based on pure market driven appreciation and the passage of time, over and above the value of the hotel as calculated solely on a discounted cash flow basis. With this in mind, the Court will increase its $21.2 million base valuation of the hotel by $1.8 million, and fix the fair market value thereof, for present purposes, at an even $23 million.

*Feasibility*

The court turns next to an evaluation of Fremont's objections to the Debtor's reorganization plan, which consist, as previously noted, of arguments which run to the issues of feasibility and fairness. Addressing first the question of feasibility, the Court notes applicable law as articulated in a leading treatise:

8. Indeed, Cushman and Wakefield apparently *just recently* increased its estimate of value by $1 million (from $25 million to the present $26 million) after factoring in an analysis of comparable sales. (T—2/14 at 23–24)

9. This is not an altogether uncommon phenomenon. It can be witnessed regularly, for example, in the nation's securities markets, where investors frequently bid-up stocks past the price at which experts suggest they should trade based on earnings.

Section 1129(a)(11) requires as a condition of confirmation that the court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This standard has roots in the 1898 Act but has developed its own jurisprudence since the Code's adoption.

Section 1129(a)(11) requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable. Courts have expressed this standard in various ways. The Court of Appeals for the Second Circuit has stated that "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." The Court of Appeals for the Tenth Circuit is in accord: " 'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.' In determining whether a plan meets the requirements of § 1129(a)(11), .... 'the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.' " Several courts have considered the following factors when determining if a plan is feasible:

(1) the adequacy of the debtor's capital structure;

(2) the earning power of its business;

(3) economic conditions;

(4) the ability of the debtor's management;

(5) the probability of the continuation of the same management; and

(6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

Although creditors sometimes press the issue, the possibility of failure is not fatal. As one court noted: "The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." 7 *Collier on Bankruptcy* ¶ 1129.03[11] (Matthew Bender 15th Ed. Revised) (Footnotes omitted.)

The feasibility analysis herein is complicated somewhat by the fact that Fremont's challenges are based, in part, on its assumption as to the propriety of an interest rate on its recast loan of 9.72%. This rate, in other words, was arrived at by Fremont on the basis of an assumption that the cramdown provisions of 11 U.S.C. § 1129(b)(2)(A)(i)(II) require the use of a *market* rate of interest in calculating the present value of the proposed stream of payments a secured creditor must be paid under a non-consensual plan. Fremont postulates that a *market* rate of interest in this setting is a "blended" rate comprised of 6.75% on the "senior" portion of a replacement loan and a 16% rate on a smaller mezzanine portion thereof. At the confirmation hearing Fremont offered expert testimony in support of the market rate of interest it urges. The rate, as noted, is a function of Fremont's assumption that in order to refinance the existing indebtedness on the hotel a purchaser will require two loans because, as discussed *infra*, its valuation expert has opined that no more than 65% of the hotel's value can be financed through a first mortgage loan.

The Debtor disputes all of the above. The Debtor believes that at present the market rate of interest for a refinance of

the Valley Forge Hilton is anywhere between 5% to 6.5%. The Debtor, as Fremont, offered expert testimony in support of its position as to the market rate. On this point, the Debtor's position, as Fremont's, is a function of its assumption regarding maximum loan to value financing availability (70% to 80%) and risk based on income projections.

Based upon its position as to the market rate of interest question, the Debtor, in its plan, proposes a 6.5% rate of interest on Fremont's recast loan. Before considering whether the Debtor or Fremont has accurately identified the present market rate of interest, and thus before addressing the feasibility of the Debtor's plan based either on the cash flow needs which follow from the 6.5% interest proposed by the Debtor, or the 9.72% interest rate proposed by Fremont, the Court must digress to consider, at the outset, the Debtor's argument that this entire line of reasoning is misplaced because the need for adherence to a market rate of interest approach to the question at hand has been rejected by a recent Supreme Court decision; to wit: *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004)

Fremont addresses, but dismisses, this argument, asserting that *Till*, which involved a Chapter 13 case, has not altered existing law in Chapter 11 cases. This is an undecided question. There is no doubt that *Till* has relevance herein, the question is the degree to which it is controlling. The Court's research has located no decisions which have as yet applied or rejected *Till* in a Chapter 11 case, and neither have the parties pointed to any. It would thus

appear to remain an important question of first impression. Having considered it, the Court holds that *Till* is instructive, but it is not controlling, insofar as mandating the use of the "formula" approach described in *Till* in every Chapter 11 case. Accordingly, the Court, after detailing its rationale, will return to the question of determining an appropriate interest rate in the instant setting.

Pursuant to Code § 1129(b)(2)(A)(i)(II), a reorganization plan cannot be confirmed unless a dissenting secured creditor receives on account of its Claim "deferred cash payments totaling at least the allowed amount of [its] claim ..., as of the effective date of the plan, of at least the value of [its] interest in the estate's interest in [here—the hotel]" 11 U.S.C. § 1129(b)(2)(A)(i)(II). Relying upon *Till, supra*, the Debtor contends that an annual rate of interest of 6.5% per annum on the claim satisfies this cram down requirement. Fremont disagrees, asserting that it is entitled to a higher rate of interest, namely 9.72%, which represents a blended rate between a 6.5% rate on a senior mortgage and a 16% rate on junior debt. *See* Fremont Exhibit 6 (Interest Rate Chart—Fremont Debt).

In *Till*, the Supreme Court focused on the cram down requirement applicable to secured creditors in Code § 1325(a)(5)(B)(ii).[10] Under this section, a Chapter 13 plan cannot be confirmed unless "the value, as of the effective date of the plan, of property to be distributed under the plan on account of [each allowed secured claim] is not less than the allowed amount of such claim."[11] 11 U.S.C.

---

**10.** The Supreme Court noted that cram down plans "often provide for installment payments over a period of years rather than a single payment." *Till*, 124 S.Ct. at 1955. When a claim is paid in installments over time, "the amount of each installment must be calibrat-

ed to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim." *Id.* at 1955–56.

**11.** Discussing the purpose of § 1325(a)(5)(B), the Supreme Court stated:

§ 1325(a)(5)(B)(ii). The debtors in *Till* borrowed $6,400 on a secured basis at an interest rate of 21% to finance their purchase of a truck. Under their plan, the debtors proposed to pay the value of the truck which was $4,000 over life of the plan with interest at the rate of 9.5%. The debtors arrived· at this interest rate by supplementing the national prime rate of approximately 8% by 1.5% "to account for the risk of nonpayment posed by borrowers in their financial position." 124 S.Ct. at 1957. The secured lender objected to the rate of interest, arguing that it was entitled to the original contract rate of 21% because this was the rate which " 'it would obtain if it could foreclose upon the vehicle and reinvest the proceeds in loans of equivalent duration and risk as the loan' originally made to [the debtors]." *Id.*

The issue addressed by the Supreme Court was what rate of interest should be employed to "ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of [its] allowed claim." 124 S.Ct. at 1955–56. The Supreme Court considered four approaches in determining the applicable rate of interest: the "coerced loan rate;"

the "presumptive contract rate;" the "cost of funds rate;" and the "formula rate." It concluded that defects existed in all but the fourth approach. The Supreme Court summarized the defects in the former three approaches,[12] declaring:

> Each of these approaches [referring to the coerced loan, presumptive contract rate, and cost of funds approaches] is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value.

*Id.* at 1960. Describing the formula approach, the Supreme Court stated:

> Taking its cue from ordinary lending practices, the approach begins by looking at the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the ap-

---

[Section] 1325(a)(5)(B) entitles the creditor to property whose present value objectively equals or exceeds the value of the collateral, it does not require that the terms of the cram down loan match the terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cram down terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the very idea of a "cram down" loan precludes the latter result: By definition, a creditor forced to accept such a loan would prefer instead to foreclose. Thus, a court choosing a cram down interest rate need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it could make if permitted to foreclose.
124 S.Ct. at 1959–60.

12. In *The Chapter 11 Plan: Proposal, Confirmation and Effect of Confirmation*, 870 PLI/Commercial Law and Practice Course Handbook Series 515 (November–December 2004), Gerald F. Munitz cogently describes these three approaches. He states that the "coerced loan rate" is "the rate the creditor could obtain if it were permitted to foreclose and reinvest the proceeds in equivalent loans." *Id.* at 544. The "presumptive rate," he explains, is "the prepetition contract rate, subject to adjustment up or down based upon the particular facts of the case." *Id.* Lastly, he defines the "cost of funds rate" as the "cost the creditor would incur to obtain the cash equivalent of the collateral (*i.e.,* the interest rate the creditor would have to pay on a loan in an amount equal to the value of the collateral)." *Id.*

proach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.[13]

*Id.* at 1961. The Supreme Court explained the benefits of the formula approach, declaring:

[U]nlike the coerced loan, presumptive contract rate, and cost of funds approaches, the formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings. Moreover, the resulting "prime plus" rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor. For these reasons, the prime-plus or formula rate best comports with the purposes of the Bankruptcy Code.

*Id.* at 1961–62. The Supreme Court also instructed that, when using the formula approach, bankruptcy courts must hold a hearing at which the parties may present evidence about the appropriate rate adjustment and that, at such hearing, the burden rests "squarely" on the creditor. *Id.*

Since *Till,* courts have applied the formula approach to various Chapter 13 plans. *See In re Smith,* 310 B.R. 631, 634 (D.Kan.2004) (reversing bankruptcy court decision on interest rate in four Chapter 13 plans because it did not use the prime rate as its base rate and did not conduct case-by-case evidentiary hearings to determine the proper risk adjustment for each loan); *In re Cachu,* 321 B.R. 716, 725 (Bankr.E.D.Cal.2004) (ruling that the "proper cramdown rate for tax claim of $3,559.13 under 'prime plus' formula was a combination of the prime rate in effect" on the effective date of the plan which was 4.25%, "plus a risk adjustment of 0.5%."); *In re Bivens,* 317 B.R. 755, 769 (Bankr. N.D.Ill.2004) (approving interest rate of 7% comprised of 4.75% for prime rate and 2.25% for risk factor on $10,000 secured claim); *In re Harken,* 2004 WL 3019467 *2 (Bankr.N.D.Iowa) (accepting Debtor's proposed interest rate of 8% per annum on secured claim of $18,739 where prime rate was 5% at the time of the valuation hearing); *In re Pokrzywinski,* 311 B.R. 846, 850–51 (Bankr.E.D.Wis.2004) (allowing simple rather than "add-on" interest at the rate of 5.75%, where prime rate was 4.24% and the parties agreed on a risk adjustment of 1.5% on allowed secured claim of $13,500). *See also Baxter v. Berksteiner (In re Berksteiner),* 2004 WL 2201300 *2 (Bankr.S.D.Ga.) (holding that where the debtor has proposes an interest rate in its plan or where the debtor's plan is silent as to an interest rate and the local rule applying a default rate of 12% applies, any creditor who opposes the interest rate must object to confirmation).

Whether *Till* applies to Chapter 11 plans is open to debate. *See* Ronald Greenspan & Cynthia Nelson, *"Untill" We Meet Again, Why the Till Decision Might Not Be the Last Word on Cramdown Interest Rates,* 23 Jan. Am. Bankr.Inst. J. 48 (Dec./Jan.2005) (discussing whether footnote 14 in *Till* "nullifies *Till* in the Chapter 11 context (or at least instances where

---

**13.** The Supreme Court noted that some of the evidence relating to these factors (circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan) "will be included in the debtor's bankruptcy filings ... so the debtor and creditors may not incur significant additional expense." 124 S.Ct. at 1961.

efficient markets exist), modifies its application or is merely an irrelevant musing."); Daniel Carragher, *What The Supreme Court's Prime Plus Ruling Means for Chapter 11*, 23–August Am. Bankr.Inst. J. 26 (July/August 2004) (discussing the reasons why "the *Till* ruling should not affect existing precedents under chapter 11."); Michael Cook & Leslie Chervokas, *Supreme Court Disappoints Secured Lenders*, 21 Bankruptcy No. 9 Strategist 1 (July 2004) (noting that "the Supreme Court's plurality [in *Till*] acknowledged that the Chapter 13 cramdown analysis should apply in Chapter 11 and 12 of the Code," but that the plurality also acknowledged that "an efficient market [exists] for Chapter 11 DIP financing[.]"); H. Hildebrand, *Till: Prime Plus*, 2004 No. 7 Norton Bankruptcy Law Advisor, 2 (reasoning that even though the language of § 1325(a)(5)(B) closely parallels the language of § 1129(a)(7)(A), that does not "automatically lead to the conclusion that the 'prime plus risk factor' is the interest rate in a Chapter 11 case[.]"). At one point in its opinion, the Supreme Court strongly suggested that its decision applies to Chapter 11 cases. Citing to similar cram down provisions in Chapter 11, the Supreme Court observed:

> [T]he Bankruptcy Code includes numerous provisions that, like the cram down provision, require a court to "discoun[t] ... [a] stream of deferred payments bank to the[ir] present dollar value to ensure that a creditor receives at least the value of its claim. We think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions."

124 S.Ct. at 1958–59 & n. 10 (citation omitted). However, at another point in its opinion, the Supreme Court highlighted a difference between Chapter 13 and Chapter 11 cases and reasoned that, in view of this difference, another approach for determining the appropriate rate of interest may "make sense" in a Chapter 11 case. The Supreme Court made this point by observing that "[by] definition a creditor forced to accept [cram down] loan would prefer instead to foreclose," and then stating in a footnote that:

> This fact helps to explain why there is no readily apparent Chapter 13 "cram down market rate of interest": Because every cram down loan is imposed by a court over the objection of the secured creditor, there is no free market of willing cram down lenders. Interestingly, the same is *not* true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession. *See, e.g.*, Balmoral Financial Corporation, http://www.balmoral.com/bdip.htm (all Internet materials as visited Mar. 4, 2004, and available in Clerk of Court's case file) (advertising debtor in possession lending); Debtor in Possession Financing: 1st National Assistance Finance Association DIP Division, http://www.loanmallusa.com/dip.htm (offering "to tailor a financing program ... to your business' needs and ... to work closely with your bankruptcy counsel"). Thus, when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce. In the Chapter 13 context, by contrast, the absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure.

124 S.Ct. at 1959 n. 14.

In the opinion of the Court, the present case represents what is perhaps an object instance for consideration of the exception which the Supreme Court discusses in the above footnote. In *Till*, the Court sug-

gests, that other things being equal, the formula approach should be followed in Chapter 11 just as in Chapter 13. The Court's caveat in footnote 14, however, speaks to an exception where an efficient market exists which may obviate the need for resort to the formula approach, or perhaps lessen the virtues of that approach. Such markets, it says, exist in the area of DIP financing. The Supreme Court's dicta implies that the Bankruptcy Court in such circumstances (i.e., efficient markets) should exercise discretion in evaluating an appropriate ·cramdown interest rate by considering the availability of market financing.

■ The facts of this case clearly demonstrate that, at present, there is at least as strong a market for post-confirmation realty financing as there is for pre-confirmation debtor-in-possession financing. Indeed, both of the parties' appraisers and both of the parties' interest rate experts were in agreement on that very point. (T—2/14 28, 33, 96, 140) Demand for hotel investments is high. It appears in fact to be a "seller's market," with financing readily available. That being the case, the concerns which underlay the Supreme Court's adoption of a formula approach in *Till* might not be present here. While the Court has slight doubt that the formula approach set forth in *Till* will probably "make sense" in most Chapter 11 cases, the exception arguably has relevance here. The Court is convinced that had the Supreme Court intended mandatory observance of the formula approach in every Chapter 11 case, it would not have bothered to discuss the existence of a scenario in which resort to an alternative should be considered, and perhaps used. Under the present circumstances, therefore, the Court has attempted to discern from the evidence adduced what the market rate of interest is for present purposes. Unfortunately, and as hereinafter discussed, its attempt has proved unavailing.

The parties' appraisers did not offer "expert" opinions on interest rates presently available in the market place, nor were they "qualified" by the parties for that purpose. Each appraiser, however, opined that, due to the strength of the present transactional market, financing is readily available. (T—2/14 at 28, 33, 61, 96, 140) To buttress the point, the parties each offered separate expert opinion testimony on specific rates currently available.

The Debtor's interest rate expert was Gerry Swartz, the principal of Pergolis Swartz Associates. In the opinion of Mr. Swartz, the current fixed market rate for the financing of a first mortgage loan, such as would be necessary for the Debtor to retire the entire Fremont debt, is between 5% and 6.5%. Mr. Swartz's opinion was based on the assumption that the loan in question would be on the terms provided in the Debtor's plan; to wit: a seven year loan, based on a 25 year amortization, with a balloon payment due at the end of the term (T—2/14 at 50) His conclusion was further based on an assumed value of the hotel of $26 million, and his opinion that financing of up to 80% could be obtained from an institutional caliber lender within one year. (T—2/14 at 53, 55) [14] Needless to say, Fremont's witness offered a decidedly different opinion. Fremont's interest rate expert was Richard Armstrong, First Vice President of Love Funding Corporation. Mr. Armstrong assumed the availability of at most 65% first mortgage fi-

---

**14.** In Mr. Swartz's view, the Valley Forge Hilton is a "B" class hotel (New York's Plaza and Philadelphia's Four Seasons being contrasted as Class "A" hotels), while institutional or category "A" lenders are typified by the nation's largest commercial and investment banks (T—2/14 at 57, 64).

nancing at 6.75% and the need, therefore, to resort to mezzanine financing for the balance of the financing necessary to retire the Fremont loan.

Per Mr. Armstrong, the mezzanine portion of any loan, would, of course, be at a higher rate of interest (16%). Mr. Armstrong assumed a hotel value of $20.9 million in reaching the conclusion that the fair market blended rate for two loans totaling $20 million loan would be 9.72%. Conveniently, Mr. Armstrong also computed a blended market rate assuming a hotel value of $23 million. This was 9.09% (Fremont Exhibit 6, T—2/14 at 142)

To summarize, the Debtor, in the first instance, believes that *Till* controls and that the appropriate interest rate herein, assuming the validity of its valuation of the hotel and available loan to value financing, is the prime rate on the date it filed its reorganization plan (4.5%; 9–17–2004), increased, per *Till*, by 2% for risk factors, for a total rate of 6.5%. This rate, it stresses, is actually at the high end of the available market rate of interest according to Mr. Swartz, and exceeds the 6% legal rate of interest to which Fremont, as a judgment creditor is entitled under Pennsylvania law.

■ Fremont, in contrast, argues that *Till* does not control and that two loans will be required to refinance its debt. Fremont contends that the blended market rate, based on the availability of a maximum of 65% first mortgage financing is 9.72%. As with valuation of the hotel, the parties each presented credible interest rate evidence which cannot be easily or entirely reconciled. The fault lies perhaps in the fact that, as with valuation, the opinions of the parties' experts depended to a considerable extent on pure judgment calls. Neither witness is an actual lender, and the debtor obviously does not have a loan commitment in hand. The latter, of course, might be the "proof of the pudding." In the Court's view, the experts' widely divergent opinions were to a degree off-setting. Of equal significance, each opinion seemed based to an uncomfortable degree simply on anecdotal stories about other transactions in which the experts were involved, that were not particularly comparable, or on their visceral instincts about the state of the marketplace. In either instance, however, the details which underlay their opinions were insufficiently shared with the Court to an extent which would permit it to make a meaningful comparison with the facts of this case. The Court is constrained, therefore, to conclude that, although this case presented an occasion upon which it indeed made sense to inquire as to what the relevant market rate of interest might be, the totality of the evidence presented did not permit a sufficiently informed conclusion to be drawn. Put differently, this case demonstrates that the mere existence of an efficient market does not guarantee that the shortcomings of the coerced loan approach to rate setting, as described in *Till*, will automatically be overcome. The Court will thus fall back upon *Till*, and the formula approach, as the preferred means for setting the interest rate herein.

■ On this score, the Court quickly registers its disagreement with the Debtor's contention that the relevant prime rate of interest is that which existed on the date its reorganization plan was filed. To the contrary, the required date under Bankruptcy Code § 1129(b)(2)(A)(i)(II) is the effective date of the plan. In support of its position, the Debtor cites to the decisions in two Chapter 13 cases. In the first *In re Carson*, 227 B.R. 719, 723 (Bankr.S.D.Ind.1998) the court held that the relevant date to determine the interest rate in a cramdown Chapter 13 case was the *petition filing* date, reasoning that the

prime rate on the date of filing is usually the same as, or very close to, the prime rate on the date of confirmation. The second case cited by the Debtor, *In re Knight*, 254 B.R. 227, 230 (Bankr.C.D.Ill. 2000) also adopted the petition date, but without analysis, and based solely on that Court's impression that the petition date represented the majority view. Whether the petition date represents the "majority" view in Chapter 13 cases is debatable, as is the proposition that in a Chapter 13 case the confirmation date is close to the petition filing date. In the experience of this Court several months often intervene between the two dates. In any event there is certainly authority to the contrary. *See Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982) (current market rate for similar loans in Chapter 13 case should be determined at the time the new loan is made, which is date of confirmation of plan.) The reasoning of *Carson*, moreover, breaks down altogether in the context of a Chapter 11 case, as certainly it can rarely be said with confidence that the prime rate on the date a Chapter 11 case is filed is likely to be the same as, or very close to, the prime rate on the date of plan confirmation. Indeed, this case illustrates that point.

Meanwhile, the statute, of course, speaks clearly to present value being determined on the "effective date" of the plan. Bankruptcy law's leading treatise, after noting that the Bankruptcy Code does not define the phrase "effective date" concludes that ordinarily the effective date will be the date on which the confirmation order is entered:

The relevant date for all determinations of present value required by the Code is the "effective date" of the plan. The Code does not define "effective date." Rather, the terms of each confirmed plan will set the effective date. Most often, the effective date of the plan will be tied to the absence of any successful appeals from the order of confirmation, or the satisfaction of conditions contained in the plan. In the absence of any contrary indications, and since the chapter 11 discharge is effective upon confirmation absent contrary indications in the plan, the date the confirmation order is entered should be the effective date.

7 *Collier on Bankruptcy* ¶ 1129.06[1][e] (Matthew Bender 15th Ed. Revised) (Footnotes omitted.)

 The prime rate as of today is 5.75%. This rate, therefore, will be the applicable base rate.[15] The risk premium, per *Till*, will normally fluctuate between 1% and 3%. *Id.* at 1962 The appropriate size of the adjustment, per *Till*, will depend on factors such as the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan. The creditor bears the burden of proof on this issue. *Id.* at 1961. In this instance, Fremont has raised certain legitimate questions as to the feasibility of the Debtor's plan; however it has done little to overcome the evidence which indicates both that the Debtor's operations are improving apace, and that the value of Fremont's collateral is appreciating steadily. The Court thus views the risks attendant to the proposed loan as neither negligible nor extreme. Based upon this, the Court will require the addition of a 1.5% risk premium to the aforesaid prime rate for the recast Fremont loan. Having so

---

15. Assuming, that is, that it remains the rate on the date a confirmation order is ultimately entered in this case. The rate of course could change. For practical reasons the present rate will nevertheless be used herein for analysis of the feasibility question. (Notwithstanding that confirmation will be denied for other reasons).

concluded, the Court turns next to an assessment of the feasibility of the Debtor's plan.

**Feasibility**

█ Having determined the required interest rate for a permissible recasting of the Fremont loan, the Court turns to the overall feasibility of the Debtor's plan. Once again, the parties are in sharp disagreement and the evidence is uneven. Fremont's arguments focus on the Debtor's performance during the pendency of this case and the cash balance it had on hand as of January 31, 2005. As to the former, Fremont argues that the Debtor's "trailing" cash flow is significantly below that which will be needed to fund the interest, and later the interest and principal, on Fremont's recast debt. Even with the projected improvement in its revenues, says Fremont, the Debtor will be unable to meet its obligations under the plan, even if one accepted the Debtor's proposed rate of interest on the new Fremont loan. (Fremont Exhibit F–19) On this point Fremont emphasizes that by the Debtor's own admission it will need $1.1 million in cash to fund payments that will fall due on the effective date of its plan, yet its cash balance on January 31, 2005 was only $685,203.

The Debtor offers a variety of responses. First, it argues that focusing on its trailing earnings is misleading, because by all accounts its fortunes are improving. Secondly, the Debtor argues that Fremont's evidence is misleading because A) it utilizes the more conservative income projections of Fremont's appraiser, and B) it fails to take into account the fact that, if cash flow is short, payments to affiliate creditors must be foregone in favor of keeping Fremont current. Finally, as to both its future cash flow and its present cash balance, the Debtor emphasizes 1) that Martin Field has repeatedly testified that he is willing and able to find funding such that required payments will be made and 2) that the funding needs it posits are conservatively high since it may prevail in objecting to the claims of some of its creditors.

Having considered the parties' competing positions, the Court finds that even with the required increase to the proposed interest rate on Fremont's loan, the plan satisfies the relatively low threshold of proof needed to meet the confirmation requirement of feasibility.

The Court first underscores that, by reason of its determination of the necessary interest rate in this case, the pressures on the Debtor's cash flow will be greater than it anticipates.[16] The prime rate, as this is written, stands at 5.75%. Adding a 1.5% risk premium produces a required rate of 7.25%, or .75% higher than the Debtor's proposed rate of 6.5%. The Court also notes, however, the Debtor's argument that payments to affiliate creditors will not be made if cash flow is insufficient to pay Fremont. There will, in fact, be no uncertainty on this point because, as hereinafter discussed, the Court finds that those provisions of the plan which permit payments to affiliate creditors to be made ahead of Fremont are fundamentally unfair and must be stricken. The Court further notes the Debtor's argument that Mr. Field will cause any shortfall in cash flow to be covered. As hereinafter discussed, the Court stops short of holding that the failure of Mr.

---

**16.** On this issue, the Court notes, but dismisses, the Debtor's argument that Fremont's evidence should be disregarded because it is predicated on the future projections of HVS. As previously discussed, the Court finds these projections to be more credible than those of the Debtor and/or Cushman and Wakefield.

Field or the other interest holders to *commit* to making a capital infusion in this context is a fatal flaw. However, as with the payment to affiliate creditors, the Court finds that those provisions of the plan which permit this result, while enjoining actions against guarantors, are fundamentally unfair and therefore bar confirmation. Where matters will go from here is unknown to the Court, nevertheless the Court is sufficiently convinced that, having built the hotel and run it for 35 years, there is good reason to believe that Mr. Field would indeed cause funds to be infused into the entity, if necessary to avoid a default which would trigger foreclosure, loss of his equity and action on the guarantees.

The Court, finally, reiterates that the evidence supports a finding that the value of the hotel is appreciating and that a refinancing of Fremont's debt could potentially be achieved long before the balloon payment date arrives. Purely from a feasibility standpoint therefore the Court finds the Debtor's plan to pass muster. Having so concluded, the Court turns next to the question of whether the plan is otherwise confirmable.

**Discrimination and Fairness**

Section 1129(b)(2)(A) of the Bankruptcy Code provides in relevant part that a plan must not discriminate unfairly and must be fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. Fremont maintains that the Debtor's plan fails to satisfy the above requirements for three specific reasons: A) because it does not provide for an equity infusion by interest holders; B) because insiders are receiving preferential treatment; and C) because the guarantees of Martin Field and the Field Family Trust will be released.

The Debtor counters that A) no equity infusion is required under the present circumstances because the Debtor proposes to pay 100% of its debt; B) that it is fair for insiders to receive some money before Fremont, because the insiders loaned money to the Debtor after Fremont, which money was used to pay for the roughly $7 million in renovation work performed between 1999 and 2004; C) that the insiders only receive payment if the Fremont debt is current, and D) that it is fair to enjoin actions against the guarantors 1) because of all the money Mr. Field has personally paid or "brought into" the hotel thus far, 2) because Mr. Field has promised to fund or find funding for plan obligations if cash flow from the hotel falls short, and 3) because the forbearance provisions of the plan will afford Mr. Field the opportunity to sell or refinance the hotel without the interference of personal collection actions.

The Court has considered the parties' positions on this question and finds Fremont to have the better part of the argument. The Court accordingly concludes that the plan fails to satisfy the discrimination and fairness tests for a cramdown plan, and that confirmation of the plan must therefore be denied. The Court will address the issues in turn.

### I. Requirement of an Equity Infusion

█ The Debtor prevails on this point in at least one respect—an equity infusion by the interest holders is not, as a purely technical matter, required in this instance. In arguing to the contrary, Fremont, in effect, is asserting that the plan runs afoul of the absolute priority rule.

The argument that the plan violates the absolute priority rule is made implicitly; Fremont never uses the precise term. But what Fremont does say is that the plan is defective because it does not provide for an equity infusion from the partners. The term "equity infusion" refers, of course, to what is known as the new

value exception. That exception applies to what is known as the absolute priority rule. *See Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 116–118, 60 S.Ct. 1, 7–9, 84 L.Ed. 110 (1939). So for the Debtor to be required to provide new value in the form of an equity infusion, its plan as proposed must violate the absolute priority rule; otherwise, there would be no need to invoke the exception. Does the plan violate the absolute priority rule?

That rule is codified in Section 1129(b)(2). *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 442, 119 S.Ct. 1411, 1416, 143 L.Ed.2d 607 (1999). In pertinent part, that section provides:

> For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A). As a matter of fairness and equity, this rule requires that "the creditors ... be paid before the stockholders could retain [equity interests] for any purpose whatever." *Northern Pacific R. Co. v. Boyd,* 228 U.S. 482, 507, 33 S.Ct. 554, 561, 57 L.Ed. 931 (1913).

The Debtor maintains that its plan satisfies the above requirements. Prussia Brief, 18. The plan provides that Fremont shall have an Allowed Claim which shall consist of all principal, interest, fees and charges owed by Debtor as of the effective date. Ex. D–1, Plan, § 3.4. As to Fremont, an Allowed Claim is as the plan defines it. *Id.* § 1.2. The plan proposes to pay Fremont interest only for the first 12 months. Thereafter, Fremont shall receive interest plus principal amortized over 25 years. After seven years into that repayment schedule, the full balance due is payable to Fremont. *Id.* § 3.4. If adhered to the plan will pay Fremont in full. For that reason, again technically speaking, no equity infusion from the Debtor's principals is required.

## II. Fairness of No Equity Infusion and Preferential Treatment of Insiders

Although the interest holders of the Debtor are not required to make an equity contribution given the literal terms of the reorganization plan, Fremont, as noted, nevertheless questions whether the entire scenario is not, in fact, inequitable and unfairly discriminatory. At the outset, the Court observes that it is appropriate to consider that question.

The examples of unfair and inequitable treatment listed in § 1129(b)(2)(A)-(C) are not exhaustive. As a matter of

general statutory construction, the Bankruptcy Code provides that the word " 'includes' ... [is] not limiting." 11 U.S.C. § 102(3). *See 7 Collier on Bankruptcy*, ¶ 1129.04[4][b] (stating that 1129(b)(2) contains but possible examples of what may constitute fair and equitable treatment). Paragraph (b)(1), therefore, exists independent of the instances of unjust treatment set forth in Paragraph (b)(2). There are other ways in which a plan provision may be so unjust as to a dissenting creditor as to require denial of confirmation. The Debtor's plan provides one example.

█ The plan proposes to give insiders a cash flow note on the Effective Date. That note will provide for payment based on (1) the performance of the Reorganized Debtor and (2) keeping current with Fremont. For the first two years, the insiders will receive interest only (paid annually, at 6%). Thereafter, the notes may be paid in full at any time so long as the Debtor is not otherwise in default under the plan. Fremont is thus correct when it maintains that insiders may be paid in full long before Fremont receives payment of its principal debt. The Court finds that sufficiently inequitable as to warrant denial of confirmation.

The Court agrees with Fremont that to a large extent the Debtor's plan effectively shifts the entire risk of failure from the Debtor and the insiders to Fremont. On this score, the Court notes that all of the witnesses who testified in this proceeding agreed that the hotel industry is very cyclical. Mr. Eisenberg opined that a typical cycle might be six years or eight years. (T—1/27 at 79, 80) Accepting that an average of seven years is a reasonable estimate of the hotel business cycle, the Court next notes that both Mr. Eisenberg and Mr. Field agree that the industry is essentially at the beginning of the upwards portion of the cycle. (T—1/27 at 80; 117–119) While this may bode well for the hotel's operations in the near term, the fact remains that, when the Fremont recast loan is set to "balloon," the industry may well be at the low point of its business cycle. Put another way, despite Mr. Field's intention to sell the hotel in the next few years (T—1/27 at 119, 137) and despite the fact that both the economics of the industry and anticipated enhanced performance by the Debtor may facilitate his aims, if, for any reason, he is unable to sell or refinance, the Fremont debt will mature at what the Debtor acknowledges could be the trough or worst point in the hotel industry business cycle.

█ It will clearly be no easier to sell or refinance the hotel at the low point in the cycle if it could not be done at higher points. Yet, by the seventh year, assuming the Debtor keeps Fremont current, it seems more likely than not that the insider creditors will have been repaid all of their debts in full. This is profoundly unfair, and it is not made any the less so because the affiliate creditors are friends of Mr. Field or because they loaned money to the Debtor after Fremont did. Such arguments have no merit. As put by one District Court:

> The concept of fair and equitable involves more than application of a mechanical calculation of absolute priority based on distribution of property valued abstractly. When the proposed distribution would substantially shift the risk of failure of the plan from a junior class to a senior dissenting class for no legitimate purpose, the plan is not fair and equitable to the dissenting class.

*In re Monarch Beach Venture, Ltd.,* 166 B.R. 428, 436 (C.D.Cal.1993) *citing In re Consul Corp.,* 146 B.R. 979, 989 (Bankr. D.Minn.1992). This teaching applies herein, and confirmation of the plan will be denied on this basis.

■ Another equally objectionable provision of the Debtor's reorganization plan lies in its forbearance terms. Section 524(e) of the Bankruptcy Code provides that a bankruptcy discharge does not discharge the obligations of any non-debtor party. Courts have generally construed this statutory provision as prohibiting bankruptcy plans from modifying or releasing the obligations and liabilities of guarantors under third party guarantees and prohibiting bankruptcy courts from preventing the enforcement of such guarantees.[17] While the Third Circuit has not definitely ruled on the issue of whether non-debtor releases and permanent injunctions are appropriate or permissible, it has stated that at a minimum, any plan which provided for such would have to reflect what it called the "hallmarks" of permissible non-consensual releases; to wit: fairness, necessity to the reorganization, the exchange of reasonable consideration, and specific factual findings by the Bankruptcy Court relative to these factors. *See, In re Continental Airlines,* 203 F.3d 203, 214 (3d Cir.2000)

Fremont invokes *Continental* and argues vociferously that its requirement of fairness, necessity, and consideration are unmet. The Debtor, on the other hand, protests that *Continental* is not implicated because, contrary to Fremont's contentions, the plan does not include either a release or a permanent injunction in favor of the guarantors. The Debtor is technically correct, insofar as it goes.

The injunctive provisions of plan are characterized by the Debtor as a "forbearance" for a finite term of seven years. The Debtor is correct that the temporal nature of the injunction places it on a somewhat different footing, at least from a jurisdictional perspective. *See* 25 No. 1 *Bankruptcy Law Letter* 1 (Jan 2005). Temporary or status quo injunctions have been sanctioned by the Supreme Court as an available tool to promote a Debtor's reorganization effort. *Continental Illinois Nat. Bank & Trust Co. of Chicago v. Chicago, R.I. & P. Ry. Co.,* 294 U.S. 648, 675, 55 S.Ct. 595, 605–606, 79 L.Ed. 1110 (1935); *Celotex Corp. v. Edwards,* 514 U.S. 300, 310, 115 S.Ct. 1493, 1500, 131 L.Ed.2d 403, (1995); *see also In re Seatco, Inc.,* 257 B.R. 469, 478, modified at 259 B.R. 279, (Bankr.N.D.Tx.2001) (holding that flaws in Debtor's proposed Chapter 11 plan, purporting to temporarily enjoin creditor from pursuing its rights against non-debtor, such as a guarantor, while a creditor was receiving payments under plan, did not effect liability of non-debtor in violation of bankruptcy statute, where injunction would continue only while debtor was current in its plan payments and would terminate automatically, with no need for further court action if debtor defaulted.)

In the interest of completeness, the Court will consider the confirmability of the Debtor's plan under both variants, i.e., permanent and temporary injunctions.

### A. *Permanent Injunctions*

Section 524(e) of the Bankruptcy Code explicitly states that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for such debt[.]" 11 U.S.C. § 524(e). Based on this provision, three circuit courts have held that permanent injunctions discharging non-debtors from liability are not allowed in reorganization plans. *See Resorts International, Inc. v. Lowenschuss,* 67 F.3d 1394, 1401 (9th Cir.1995) ("This Court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *Feld v. Zale Corp. (In re*

---

17. *See SK 005 ALI—ABI 433–438, 2004 and* *cases cited therein.*

*Zale Corp.),* 62 F.3d 746, 760 (5th Cir.1995) (permanent injunctions discharging a potential debt of a nondebtor are not allowed by bankruptcy code); *Landsing Diversified Props.—II v. First National Bank & Trust Co. (In re Western Real Estate Fund, Inc.),* 922 F.2d 592, 601–602 (10th Cir.1990), *modified sub nom., Abel v. West,* 932 F.2d 898 (10th Cir.1991) (holding that the automatic stay "may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor.").

However, other circuit courts have ruled that permanent injunctions against nondebtor parties are allowable under certain circumstances. The Seventh Circuit allows consensual, non-coercive permanent injunctions which are essential to a plan of reorganization. *See In re Specialty Equip. Cos., Inc.,* 3 F.3d 1043, 1047 (7th Cir.1993) ("[C]ourts have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code. Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors. It binds only those creditors voting in favor of the plan of reorganization."). The Second, Fourth and Sixth Circuits permit non-consensual permanent injunctions *when* specific factors are present. *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),* 280 F.3d 648, 658 (6th Cir.), cert. denied, 537 U.S. 816, 123 S.Ct. 85, 154 L.Ed.2d 21 (2002) (ruling that non-consensual third-party injunctions are appropriate only when unusual circumstances exist and that certain factors must be present to support a finding of "unusual circumstances.");[18] *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 293 (2nd Cir.1992) ("[A] court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization."); *Menard–Sanford v. Mabey (In re A.H. Robins Company, Inc.),* 880 F.2d 694, 700–02 (4th Cir. 1989) (permitting permanent injunction against non-debtor party where the plan of reorganization was "overwhelmingly approved" and success of plan hinged on prevention of "suits against parties who would have indemnity or contribution claims against the debtor.").[19] These factors include the following:

(1) The third party made an important contribution to the reorganization;

(2) The release is "essential" or "important" to the reorganization;

**18.** In *Patton v. Bearden,* 8 F.3d 343, 349 (6th Cir.1993), the Sixth Circuit observed:

"Some courts have held that the debtor's stay may be extended to non-bankrupt parties in 'unusual circumstances.' *See A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (4th Cir.)., cert. denied, 479 U.S. 876, 2107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Kanawha Trace Dev. Partners,* 87 B.R. 892 (Bankr. E.D.Va.1988). Such circumstances usually include when the debtor and the non-bankrupt party are closely related or the stay contributes to the debtor's reorganization. It should be noted that such extensions, although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court after hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate."

**19.** In *Stuart, L.L.C. v. First Mount Vernon Industrial Loan Association (In re Peramco International),* 3 Fed.Appx. 38, 42 (4th Cir. 2001), the Fourth Circuit ruled on consensual permanent injunctions, stating: "Section 524(e), a general provision that does not apply only to Chapter 11 proceedings, does not divest the bankruptcy court of jurisdiction to confirm a Chapter 11 reorganization plan that settles a creditor's rights as to property held by a non-debtor where the creditor has approved of and voted for the reorganization plan."

(3) A large majority of the impacted creditors has approved the plan containing the release;

(4) A close connection between the cases against the third party and the case against the debtor exists; and

(5) The plan provides for the payment of substantially all of the claims affected by the release.

*In re Seatco, Inc.*, 257 B.R. at 474 (Bankr. N.D.Tex.), *see also In re Mahoney Hawkes, LLP*, 289 B.R. 285, 297–98, 302–03 (Bankr.D.Mass.2002) (concluding that plan with permanent injunction could not be approved because partners failed to "resoundingly demonstrate" that they met five factor test).[20]

The Third Circuit has not ruled on "the validity of provisions in chapter 11 plans of reorganization releasing and permanently enjoining third party actions against nondebtors." *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 211 (3d Cir.2000). In *Continental*, where the Third Circuit discussed the issue, the court concluded that it could rule on the matter before it without resolving the issue. *Id.* at 214. The court reasoned that, under any rule that it might adopt, the releases at issue were impermissible because the "*hallmarks* of permissible non-consensual releases—*fairness, necessity to the reorganization, and specific factual findings to support these conclusions*" were all absent. *Id.* (emphasis added) *See also In re PWS Holding Corporation*, 228 F.3d 224, 247 (3d Cir. 2000) (discussing its ruling in *Continental*). The Third Circuit succinctly stated: "Because the release and permanent injunc-

tion before us are so clearly invalid under any standard, we need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration." *Gillman*, 203 F.3d at 214 n. 11.

██ Based on the Third Circuit's ruling in *Continental*, non-consensual releases which are unnecessary to a reorganization and not given in exchange for fair consideration are invalid under even the most flexible test for the validity of nondebtor releases. Accordingly, a permanent injunction or release against a third party is "clearly invalid" under any standard unless it is: (1) necessary to a debtor's reorganization; and (2) given in exchange for fair consideration. *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr.D.Del.2001) ("The question of necessity requires demonstration that the success of the debtor's reorganization bears a relationship to the release of the non-consensual parties, and that the releasees have provided a critical financial contribution to the debtor's plan that is necessary to make the plan feasible in exchange for receiving a release of liability."). *See also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 222 (Bankr. D.N.J.2000) (concluding that exculpatory clauses were "legally insupportable" because the proponents "failed to establish any basis to support the fairness or necessity of the non-debtor releases.").

As worded, the injunction against Fremont in section 3.4 of the Plan is arguably a temporary injunction. It bars Fremont from enforcing "its Claim against any oth-

---

**20.** The Sixth Circuit identified seven factors which must be present to support a non-consensual injunction in favor of a non-debtor. In addition to the five factors listed above, the Sixth Circuit included the following two factors: the plan provides an oppor-tunity for those claimants who choose not to settle to recover in full; and the bankruptcy court made a record of specific factual findings that support its conclusions. *Dow Corning, supra,* 280 F.3d at 658.

er party other than the Reorganized Debtor unless and until the reorganized Partnership has failed to perform its obligations under the Plan in relation to Fremont." Since the Plan requires the Reorganized Debtor to pay Fremont in full within seven years of the effective date of the Plan, the injunction is not permanent but will expire, at the latest, in seven years. However, Martin Field, who guaranteed the Loan, is 74 years old. If the injunction expires after his death and the distribution of his estate, but before the Reorganized Debtor's satisfaction of Fremont's Claim, one could argue, as Fremont does, that the injunction might as well be permanent, because Fremont's opportunity to enforce its Claim against Martin could be lost.

If the injunction against Fremont is viewed as a permanent one, it is clearly impermissible. While Martin Field testified that the injunction would be helpful to the Debtor's reorganization, he did not testify that it was "necessary." Moreover, there is no evidence in the record that the injunction was given in exchange for any "consideration," let alone "fair consideration." *See In re Exide Technologies,* 303 B.R. 48, 76 (Bankr.D.Del.2003) (disapproving of subordination injunction in plan because there was "no evidence that any value" was given "to creditors or equity holders in exchange" for the injunction or that it was "necessary for the Plan's success."); *In re Boston Harbor Marina Company,* 157 B.R. 726, 732 (Bankr. D.Mass.1993) (rejecting permanent injunction and release since "parties who would benefit by the release and injunction are contributing nothing to the Plan."). Lastly, the record does not disclose the type of "extraordinary circumstances" or "unusual facts" required to support a non-consensual third party injunction or release. *See Continental,* 203 F.3d at 212 (noting that, in contrast to the circuits holding that non-

debtor releases and injunctions are impermissible, some circuits have adopted a "more flexible approach, albeit in the context of extraordinary cases."); *see also In re Genesis Health Ventures, Inc.,* 266 B.R. at 608 ("[T]he message of *Continental* appears to be that the type of financial restructuring plan under consideration here would not present the extraordinary circumstances required to meet even the most flexible test for third party releases.").

### B. *Temporary Injunctions*

The case law on the validity of temporary injunctions is sparse. Unlike permanent injunctions, which effectively discharge a debt against third parties, temporary injunctions may not implicate § 542.

In *Feld v. Zale Corporation, supra,* the Fifth Circuit ruled that a permanent injunction of a third-party claim was impermissible because it improperly discharged a potential debt of a nondebtor in contravention of Code § 524. *Id.* at 761. However, in so holding, the Fifth Circuit noted, without elaborating, that "[t]he impropriety of a permanent injunction does not necessary extend to a temporary injunction of third party actions." *Id.*

Such temporary injunctions, the Fifth Circuit reasoned may be proper in unusual circumstances which include the following:

1) when the nondebtor and debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization.

*Id.* at 761. The Fifth Circuit instructed that, prior to issuing an injunction, a bankruptcy court must consider the traditional factors applicable to preliminary injunctions under Rule 65 of the Federal Rules

of Civil Procedure. *Id.* at 765. *But see The LTV Corporation v. Back (In re Chateaugay Corporation),* 201 B.R. 48, 71 (Bankr.S.D.N.Y.1996) (noting that "to compel adherence to the terms of a debtor's plan and to prevent violations of that plan, the debtor need not satisfy the more rigorous requirements for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure."), *aff'd in part,* 213 B.R. 633 (S.D.N.Y.1997).

The bankruptcy court in *In re Seatco, Inc., supra,* relied upon *Feld* in approving a temporary injunction (similar to the one against Fremont) contained in a Chapter 11 plan of reorganization. The temporary injunction provided as follows:

> Upon Confirmation of the Plan, all creditors of Debtor having an Allowed Claim herein shall be temporarily enjoined, pursuant to Section 105 of the Code, from proceeding against any officer, director, shareholder, employee, or other responsible person of Debtor, individually, including, but not limited to, Earl and Linda Kester, for the collection of all or any portion of their Allowed Claim, said injunction to remain in effect only for so long as the Debtor complies with the terms of the Plan. Any violation of the Plan that remains uncured for thirty (30) days after receipt by the Debtor of written notice from any party affected by such violation, shall automatically and without order of the Court result in the dissolution of the injunction granted hereunder as to said affected party.
>
> Notwithstanding the foregoing, the injunction granted hereunder shall not affect the claims and rights of CIT to proceed against Earl Kester for collection on his personal guaranty of the Debtor's obligations to CIT under the pre-Petition Date loan agreements between CIT and the Debtor; *provided however,* that CIT *is* temporarily enjoined hereunder from proceeding against Earl Kester for collection of any amounts paid or to be paid by the Debtor under the Plan.[21]

257 B.R. at 474–75 (footnote added).

In evaluating the validity of the temporary injunction, the *Seatco* Court first rejected the notion that the temporary injunction violated § 524(e) of the Code by discharging a debt of a non-debtor. The bankruptcy court stated: "While the Plan, if confirmed, will temporarily enjoin CIT from pursuing Kester for those sums being paid to it under the Plan, Kester's *liability* to CIT on the Guaranty is not affected." *Id.* at 475 (emphasis in original). *But see United States v. Prescription Home Health Care, Inc. (In re Prescription Home Health Care, Inc.),* 316 F.3d 542, 550 (5th Cir.2002) (ruling that the bankruptcy court "in essence" determined that non-debtor's current responsible party tax liability was "zero" even though injunction barring government from pursuing such tax liability against the non-debtor party was only temporary and conditional; fact that non-debtor party could become liable at some point in the future did not alter this fact).

The *Seatco* Court then turned its attention to the issue of whether it had subject matter jurisdiction over the dispute. Applying the test enunciated by the Third Circuit in *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984), for "related to" jurisdiction, the bankruptcy court concluded that "an action by CIT against Kester on the Guaranty was 'related to'" the bankruptcy case. 257 B.R. at 476 Supporting this conclusion, the bankruptcy court declared:

---

**21.** Earl Kester, who was the Debtor's President and sole shareholder, had personally guaranteed payment of the debtor's obligations to the creditor, CIT.

The evidence is undisputed that if CIT successfully pursued Kester on the Guaranty, Kester would not be able to satisfy CIT's claims and CIT would be entitled to execute against Kester's stock ownership in the Debtor, prompting Kester's resignation as President and the cessation of his involvement in the business. The evidence is also undisputed that if Kester was no longer affiliated with the Debtor, other key managers would leave, as would key customers. The record is clear—Kester's continued participation and involvement is essential to the Debtor's successful reorganization under the Plan. Thus, an

action by CIT to enforce the Guaranty "could conceivably" affect the Debtor's successful reorganization[.]

*Id.*[22]

The bankruptcy court next addressed the issue of whether it had power under Code § 105 to issue a temporary injunction as part of confirmation.[23] Relying upon the Fifth Circuit's decision in *Feld,* the bankruptcy court concluded that, despite the absence of case law wherein temporary injunctions had been entered at confirmation to further a reorganization, there was "no reason" why such a temporary injunction could not be approved.[24]

**22.** In *American Hardwoods, Inc. v. Deutsche Credit Corporation,* 885 F.2d 621 (9th Cir. 1989), the Ninth Circuit applied the same rationale in concluding that the bankruptcy court had "related to" jurisdiction to permanently enjoin a creditor from enforcing a state court judgment against nondebtors beyond confirmation of a reorganization plan. In so reasoning, the Ninth Circuit stated:

[T]he bankruptcy court found that Deutsche's enforcement of the state court judgment against the Keelers could affect the bankruptcy proceeding. The bankruptcy court predicted that Deutsche, to satisfy the judgment, would likely execute on the Keelers' stock in American. Without an interest in the company, the Keelers would have little incentive to operate American and maintain that reorganization plan. No legal obstacles have been raised to impede this scenario. Nothing in the reorganization plan shields the Keelers' stock from creditors or obligates the Keelers to continue to operate American. Moreover, based upon the findings of the bankruptcy court, there is an undeniable relationship between the administration of the bankruptcy estate and the outcome of the motion for a permanent injunction. We conclude that Deutsche's enforcement of the judgment against Keelers "could conceivably" affect the administration of American's Plan. Sections 1334(b) and 157(a) therefore confer on the bankruptcy court subject matter jurisdiction over American's motion for a permanent injunction against Deutsche.

*Id.* at 624.

**23.** In *American Hardwoods, supra,* the Ninth Circuit noted that "[s]ubject matter jurisdiction and power are separate prerequisites to the court's capacity to act. Power under section 105 is the scope and forms of relief the court may order in an action in which it has jurisdiction." 885 F.2d at 624.

**24.** In *Computer Task Group, Inc. v. Brotby (In re Brotby),* 303 B.R. 177 (9th Cir. BAP 2003) and *In re Mercado,* 124 B.R. 799, 803 (Bankr. C.D.Cal.1991), the courts concluded that Code § 105 provides authority for approving a temporary injunction enjoining collection of a nondischargeable debt. Discussing the showing that must be made for such an injunction, the 9th Circuit BAP opined:

[T]o establish the propriety of a collection injunction, the debtor must prove that it is necessary to allow the debtor to successfully reorganize and to perform the terms of the Chapter 11 plan. The injunction must also be tailored in duration and scope to afford the necessary relief to the debtor while not placing unnecessary restrictions on the target creditor's rights. In this regard, the debtor must demonstrate that the injunction does not prevent, but merely postpones, the creditor's collection of the nondischargeable claim in full pending debtor's performance of the plan. In addition, the injunction should be effectively only as long as the debtor is properly performing and complying with the terms of the plan. If the debtor fails to make plan payments or engages in conduct that unfairly frustrates the rights of the creditor to

*Id.* Finding that the Debtor had satisfied the *Feld* test for unusual circumstances, the bankruptcy court considered the traditional prerequisites for preliminary injunctions. *Id.* at 477–78 Finding that they too had been satisfied, the bankruptcy court addressed the sole remaining contention, namely whether confirmation had to be denied because the debtor had failed to seek its injunction by adversary proceeding. Concluding that CIT's rights had not been compromised by the Debtor's failure to initiate an adversary proceeding, the bankruptcy court overruled the objection to confirmation based on the temporary injunction against the non-debtor party. *Id.* at 478

The bankruptcy court in *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109 (Bankr.N.D.Tex.2002), also approved a temporary injunction. In doing so, it relied upon the fact that the continued involvement of the debtor's president, Kahn, was crucial to the debtors' reorganization efforts. The injunction at issue was the following:

> NEITHER DEBTOR, REORGANIZED DEBTOR, THE OFFICERS, GUARANTORS, AND DIRECTORS OF THE DEBTORS NOR THE SHAREHOLDERS SHALL BE DISCHARGED AND RELEASED FROM ANY LIABILITY FOR CLAIMS AND DEBTS UNDER THE PLAN, HOWEVER, ABSENT FURTHER COURT ORDER UPON NOTICE AND HEARING, THE EXCLUSIVE REMEDY FOR PAYMENT OF ANY CLAIM OR DEBT SO LONG AS THE PLAN IS NOT IN DEFAULT SHALL BE THE PLAN. TO THE EXTENT NECESSARY, ANY APPLICABLE STATUTE OF LIMITATIONS AGAINST COLLECTION FROM ANY THIRD PARTY IS SPECIFICALLY TOLLED FROM THE PERIOD OF TIME FROM THE BANKRUPTCY PETITION DATE UNTIL THE DATE UPON WHICH THE DEBTOR FAILS TO CURE ANY WRITTEN NOTICE OF DEFAULT AS SET FORTH IN THE PLAN.

*Id.* at 115. In discussing the injunction, the bankruptcy court noted that it did not release any party from liability, including Kahn, and that it merely controlled "the timing of when a claim, if any, against Kahn could be brought." *Id.* at 116. The bankruptcy court further observed that, as the injunction was worded, the temporary stay could be "lift[ed] upon uncured default under the plan, or upon a change in circumstances[.]" *Id.*

Applying the *Zale* unusual circumstances test, the *Bernhard Steiner* Court opined:

> The *Zale* unusual circumstances test has been met in this case. The success of failure of the Debtor lies mainly, if not exclusively, with the efforts, reputation, and dedication of Mr. Kahn. For all practical purposes, at this time, he is the Debtor. The Debtor will survive and creditors will be paid under the plan only if Mr. Kahn is allowed to conduct the business of the Debtor without distraction. Debtor and Kahn enjoy such an identity of interest that the prosecution of the claims, or attempted collection of any judgments against Kahn would be tantamount to prosecuting and/or seeking collection from the Debtor. Further, [the creditors'] pursuit of judgment or recovery against Kahn indi-

---

collect its claim (*e.g.,* by improperly conveying away assets), the creditor should be allowed relief from the collection injunction.

303 B.R. at 190.

vidually would have an adverse impact on the successful reorganization of the Debtor.

*Id.* at 117. Thereafter, the court focused on whether the four requirements for injunctions were met, concluding that each of them was. *Id.* at 118.

Despite its advocacy, Fremont is no doubt aware of the distinction between a temporary injunction and a release or a permanent injunction. In actuality, Fremont, as noted, appears to be suggesting that the temporary injunction in the Debtor's plan should be viewed as a de facto permanent injunction or release given the fact that its guarantor, Mr. Field, is 74 years old and the injunction lasts for seven years. This is an understandable point of view, but the Court need not dwell on it.

■■■ The Court is of the view that, even where an injunction is only temporary, a clear showing of necessity is obviously required on the part of the Debtor to justify approval of such a significant departure from customary principles of bankruptcy law. The Debtor would appear to acknowledge as much, given its attempts to defend the legitimacy of the plan's injunctive provisions. Unfortunately for the Debtor, the evidence of record on this point is most unhelpful to it. When asked why the plan included a forbearance clause, Mr. Field responded that he "wanted an opportunity to run this property unfettered by various problems and auditing requirements, etc., etc., etc., for a couple of years, maybe a year or two, and then finance this thing or sell it to someone who could put its own financing on there." (T—2–7 at 26) Questioned again on this point, Mr. Field implied that without the forbearance clause, he might be unable to continue making the payments to insiders and others which he is presently making. (T—2/7 at 28) The evidence on this point is clear and particularly disturb-

ing. Mr. Field has identified certain creditors of the Debtor, such as Grand Pacific, Joseph Selig, and his brother, Joseph Field, that he would prefer to see paid, and he is paying them. (T—2/7 at 41). When asked to justify this, Mr. Field spoke of the importance of the preferred creditors to him personally, either from a moral standpoint (T—2/7 at 29) or a business standpoint (T—2/7 at 36–37). The Court can hardly express strongly enough its disagreement with this purported justification.

First of all, if Mr. Field wants a year or two to sell the Hotel, and is confident he can do so in that time, then the term of the injunction is excessive. Secondly, the request that the Court sanction an injunction so that Mr. Field can pick and choose to prepay various friends, family members, and business acquaintances, without concern for his guarantee, makes a complete mockery of the Bankruptcy Code policy of equality of distribution. That such a request is accompanied by the failure of Mr. Field to commit to make an equity infusion into the Debtor, beyond his informal commitment to fund cash flow shortfalls, is particularly troublesome.

Ironically, the facts of this case are somewhat analogous to those in *Continental,* which is to say that this Court, like the Court in *Continental,* need not speculate on the precise circumstances which might justify the inclusion of the plan provision at issue, because the forbearance clause in the Debtor's plan is clearly invalid under any standard. Accordingly, for this reason too, confirmation of the plan must be denied.

***Summary–Re: Confirmation.***

To summarize its conclusions, the Court fixes the value of the hotel at $23 million. The Court, further, finds that *Till* does not mandate use of the formula approach in

determining the appropriate interest rate for the recast Fremont loan, because an efficient market exists for hotel investment financing, such that a market rate could theoretically be ascertained and utilized. Nevertheless, the totality of the evidence adduced at the confirmation hearing, as to present market rates, was so widely divergent, and so low in probative value, that the Court concludes that adherence to the formula approach articulated in *Till* remains the most appropriate course to follow herein.

Applying *Till*, the Court concludes that the required interest rate for the new Fremont loan must be the prime rate on the effective date of the reorganization plan, (5.75% for purposes of the present discussion), adjusted upwards by 1.5% for risk. Evaluating the Debtor's proposed plan, with this interest rate in mind, the Court concludes that although the task will be a formidable one, the Debtor's plan has a sufficient likelihood of success to satisfy the relatively low threshold of proof needed to meet the Bankruptcy Code's feasibility requirement. Notwithstanding this, the Court finds that the provisions of the plan which permit the preferential treatment of certain creditors, and which provide for a seven year injunction, discriminate unfairly against, and are otherwise unfair and inequitable to, Fremont, such that the plan, as presently constructed, is unconfirmable.

As noted earlier, the defects which the Court has identified in the plan are not so fundamental as to the preclude the possibility that they can be corrected. Accordingly, the Court will afford the Debtor that opportunity.

### Pending Fremont Motions

The court turns lastly to Fremont's pending motions. In addition to its objections to the Debtor's plan, Fremont has filed two related motions. In the first, Fremont requests that the Court either appoint a Chapter 11 Trustee, direct that the hotel be liquidated, convert the case to Chapter 7, or grant Fremont relief from the Bankruptcy stay. In the alternative, Fremont asks that the Court remove New Penn Management Company from its position as managing agent of the hotel. Fremont's preference (Fremont Brief at 29) is for relief from the automatic stay. As Fremont's arguments *vis a vis* the relief requested in the first of its Motion implicates, in part, the arguments advanced in support of its second motion, the Court will address first Fremont's Motion to displace New Penn.

Fremont's arguments for the replacement of New Penn are relatively weak. Fremont argues that the management rate being charged to the Debtor by New Penn is excessive. While the rate is certainly relevant, the evidence offered does not persuade the Court that the rate is especially out of line. Without belaboring this point, the evidence demonstrated that the fee is neither the highest nor the lowest to be found in the market. As it is within the range of reasonableness, this argument is dismissed. Fremont next argues that replacement of New Penn is warranted because the operations of the Valley Forge Hilton are being outperformed in the market, ostensibly due to the inadequacies of New Penn. This overstates the case. There is certainly a correlation between the reasons to which the Debtor alludes in explaining the dilemma in which it finds itself. (i.e., renovations, road construction and September 11, 2001) and its historical performance. The adverse consequences of these events cannot simply be laid at the doorstep of New Penn, and it ill serves Fremont to make such a disingenuous argument.

Its arguments having scant merit, Fremont's request for replacement of New Penn will be denied.

The Court turns next to the multifaceted requests of Fremont's remaining motion. Fremont's other motion is predicated, in large part, on the Court's acceptance of Fremont's position on many of the issues presented herein, such as the value of the hotel, the size of Fremont's equity cushion, the appropriate interest rate for cramdown purposes, the reasonableness of the Debtor's revenue projections, the feasibility of the proposed plan, and the fairness of certain provisions of the plan. The evidence on some of these issues tilted in favor of Fremont, but in other cases it favored the Debtor.

As there is indisputably equity in the property, Fremont's request for stay relief cannot succeed under 11 U.S.C. § 362(d)(2), because the tests for relief under this subsection of the Bankruptcy Code must be met in the conjunctive, and one them (which cannot be met) is the absence of equity. Fremont's request presents a closer call under 11 U.S.C. § 362(d)(1); i.e., "cause," because the evidence is more favorable to it. The Debtor's operations are marginally profitable at present, but its prospects seem good. Other things being equal, this might suffice to resist the Motion, however the Court cannot turn a blind eye to the Debtor's egregious violations of its loan covenants, nor to those "over-the-top" provisions of its plan which the Court has found to be patently unfair. The Court sees no cause to appoint a Trustee, or direct forced sale of the property at this time, however neither will the Court provide the Debtor with false hope. Its plan as presented is unconfirmable, for the specific reasons which the Court has taken pains herein to identify. The Debtor must either amend the plan promptly, or deal with the consequences. That said, the Court will deny Fremont's "omnibus" Motion. As noted at the outset of this Opinion, a § 105(a) status conference will be scheduled one month from the date of the order which accompanies this opinion, at which time the Court will revisit the stay relief issues and assess the likelihood that a plan of reorganization can be confirmed in this case within a reasonable period of time.

An appropriate order follows.

## ORDER

AND NOW, upon consideration of 1) the Motion of the Debtor, Prussia Associates, a Pennsylvania Limited Partnership (the "Debtor") to confirm proposed plan of reorganization, the objection thereto filed by Fremont Investment and Loan ("Fremont"), the Debtor's principal secured creditor, 2) the Motion of Fremont for Appointment of Chapter 11 Trustee and Court Approved Sale of the Real Property/Conversion to Chapter 7 Case/or Relief from Stay, and 3) the Motion of Fremont to Replace Existing Management Company, all answers in opposition thereto, and after both consolidated combined evidentiary hearings held January 27, 2005, February 7, 2005, and February 14, 2005, and consideration of the parties' written memoranda filed in support of their respective positions, it is hereby:

ORDERED, that for the reasons expressed in the within Opinion, confirmation of the plan shall be and hereby is denied; Fremont's Motion for Appointment of Chapter 11 Trustee and Court Approved Sale of the Real Property/Conversion to Chapter 7 Case/or Relief from Stay, and Motion to Replace Existing Management Company shall also be and hereby are Denied; and it is further:

ORDERED, that the Debtor is afforded an opportunity to file an amended plan. A

status hearing to ascertain the Debtor's intentions shall be and hereby is scheduled for May 3, 2005, 10:00 a.m., United States Bankruptcy Court, 900 Market Street, 2nd Floor, Courtroom No. 4, Philadelphia, Pennsylvania, 19107.

