**In re Thomas L. RIPLEY, Sr., Debtor.**

No. 08–12390 (JKF).

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 20, 2008.

Hilary B. Bonial, Brice, Vander, Linden & Wernick, Dallas, TX, Dominic A. Dececco, Hartman Shurr, Wyomissing, PA, Craig J. Fleischmann, Kraut Harris PC, Blue Bell, PA, Alan C. Gershenson, Lamm Rubenstone LLC, Trevose, PA, Deborah I. Hollander, Sheak & Korzun, P.C., Pennington, NJ, Barry D. Kleban, McElroy Deutsch Mulvaney & Carpenter, LL, Peter J. Mulcahy, Phelan Hallinan & Schmieg, LLP, Philadelphia, PA, Robert L. White, Law Offices of Robert L. White, Langhorne, PA, for Creditor.

Albert A. Ciardi, III, Nicole Marie Nigrelli, Ciardi Ciardi & Astin, P.C., Philadelphia, PA, for Debtor.

## MEMORANDUM OPINION

JEAN K. FITZSIMON, Bankruptcy Judge.

This matter is before the Court on Bank of America's Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d)(2) (the "Motion" or "Motion for Relief"). An evidentiary hearing was held on August 13, 14, and 18, 2008, the "August Hearing") and this matter is now ripe for adjudication. Upon consideration of the testimony and evidence presented at the August Hearing, as well as an examination of the relevant law, the Court concludes that while the Debtor lacks equity in his property, this property is necessary for a reorganization under Chapter 11 of the Bankruptcy Code. Therefore, for reasons more fully discussed below, the Motion is denied.

## I. BACKGROUND

### The Bankruptcy Filing

Thomas L. Ripley, Sr. ("Mr. Ripley" or the "Debtor") filed for Chapter 13 bankruptcy protection in this Court on April 10, 2008.[1] On July 16, 2008, Mr. Ripley's case

---

1. This is Mr. Ripley's second bankruptcy petition. His first petition (case number 08–10999) was filed in this Court on February 8, 2008 and dismissed on April 1.2008 for failure to obtain credit counseling prepetition or to satisfy the legal requirements of demon-

was converted to Chapter 11 of the Bankruptcy Code. The Debtor's Schedule A lists ownership of one piece of real property located at 3535 Bristol Road in Doylestown, Pennsylvania (the "Property"). Docket entry no. 19. The value of the Property is listed at $3,220.000. *Id.* Amended Schedule D lists four secured claims on the Property: 1) a first mortgage lien in the amount of $1,781,229 owed to Bank of America; 2) a second mortgage lien in the amount of $531,406 owed to Madison Bank, Division of Leesport Bank ("Madison Bank"); 3) a third mortgage lien in the amount of $1,200,000 owed to The Ohio Casualty Insurance Company ("Ohio Casualty"); and 4) 2006 real estate taxes in the amount of $5,963 owed to Bucks County Tax Claim Bureau (the "Real Estate Taxes"). Docket entry no. 64.

Stephen and Lisa Cataldo are listed on Schedule H as codebtors with regard to the loans to Ohio Casualty and Madison Bank (as well as two other debts). Docket entry no. 19. According to Schedules I and J, Mr. Ripley and his wife have a combined monthly income of $2,815 (she works as an office assistant and he as a groundskeeper) and average monthly expenses of $2,988.

On April 17, 2008, Bank of America ("BOA" or the "Bank") filed a Motion for Relief from the Automatic Stay. Docket entry no. 13. The Motion for Relief asks the Court to lift the stay on the four contiguous parcels of land which have the address of 3535 Bristol Road (previously defined as the "Property") pursuant to section 362(d) of the Bankruptcy Code.[2] Mr. Ripley filed an Objection to the Motion for Relief on July 22, 2008 (the "Objection").

Docket entry no. 56. The Objection asserts that, because the Property is valued at $3,220,000 and BOA's secured claims total $2,000,000, there is equity in the Property and the stay should not be lifted. The Debtor's Objection further asserts that BOA and Mr. Ripley reached a stipulation which resolved the Motion. However, when the parties appeared before the Court of August 13, 2008, the Bank reported that no such agreement was pending between the parties and that it wished to proceed with the Motion for Relief.

Ohio Casualty, which is a junior secured creditor and owed $1,200,000 by the Debtor, also filed a Response to the Motion for Relief. Docket entry no. 29. Ohio Casualty, like the Debtor, asserts that there "may be substantial equity in the Debtor's real estate over and above BOA's secured claims." (Ohio Casualty Response, pg. 2.)

### The August Hearing

During the three day August Hearing, Mr. Ripley and the Bank each had the opportunity to present evidence and examine witnesses concerning the value and use of the Property. After considering the pleadings, the exhibits, and the in-court testimony, the Court makes the following findings of fact in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Liens on the Property

At the August Hearing, it was established that the following mortgages are owed on the Property:

1. A $950,000 loan from BOA secured by a first mortgage on parcel numbers 9731, 9732 and 9739 of the Property (the "$950,000 Loan"). *See* BOA Exhibits one

---

strating "exigent circumstances" which would excuse his prepetition noncompliance. *See* docket no. 38.

2. Mr. Ripley resides on Parcel number 9733 of the Property. See the Objection to the Motion for Relief at 1.

and two.[3] On December 30, 2005, Bank of America confessed judgment against the Debtor in the Court of Common Pleas in Bucks County, Pennsylvania on the $950,000 Loan in the total amount of $1,096,838. BOA Exhibit 7. As of August 12, 2008, the payoff amount of the $950,000 Loan was $1,306,483. BOA Exhibit 9. Mr. Ripley has not made a payment on this loan in over three years.

2. A $400,000 loan from BOA secured by a first mortgage on parcel number 9733 of the Property (the "$400,000 Loan"). *See* BOA Exhibits 3 and 4.[4] As of August 12, 2008, the payoff amount of the $400,000 Loan was $487,690. BOA Exhibit 10.

3. A mortgage on parcel numbers 9731 and 9732 of the Property in the face amount of $500,000 recorded in September 2005 and owed to Madison Bank. *See* Motion for Relief, ¶ 21,a and the Debtor's Objection, ¶ 21,a.

4. A mortgage on all four parcels of the Property in the face amount of $1,200,000 recorded in February 2006 and owed to Ohio Casualty. *See* Motion for Relief, ¶ 21,b and the Debtor's Objection, ¶ 21,b.

### The Cataldo Property

Both Ohio Casualty and Madison Bank's loans are cross collateralized on the property of the Debtor's neighbors, Stephan A. and Lisa M. Cataldo, who own a 12 acre piece of property next to the real estate owned by Mr. Ripley. *See* Response of Ohio Casualty, pg. 2 (the "Cataldo Property"). In addition, Mr. Cataldo owes Wachovia Bank $480,000, which is secured by a mortgage on his property, and Mr. Stein (his real estate agent) approximately $200,000. Wachovia was scheduled to foreclosure on Mr. Cataldo's property October 10, 2008.[5] Mr. Cataldo testified that he has in the past and plans in the future to market his property together with the Ripleys. Mr. Cataldo and Mr. Ripley have been friends and business partners for over 30 years.

In April 2006, the Cataldos and the Ripleys had a tentative agreement with McKee Properties, Inc. ("McKee") to purchase both pieces of land. The Ripleys' Property was to be sold for $4,840,000 and the Cataldo Property for $1,660,000. *See* Agreements of Sale, Debtor Exhibits 15 and 16. According to Mr. Ripley's testimony, these agreements with McKee, which would have allowed for a full payoff of the Bank's claims at the closing, fell through because the Bank would not allow the Ripleys to come current and pay the rest at the closing of the deal.

### The Appraisal Testimony

William Bott, a professional real estate appraiser, testified for the Bank that, as of his inspection on July 31, 2008, the Property is worth $1,835,000. This is the third time that Mr. Bott has appraised the Property. He determined the Property to be worth nearly three million dollars in late 2006 and $1,995,000 in November of 2007. The Property, according to Mr. Bott's appraisal report, is improved with a single family dwelling, an apartment over the garage, a barn, and miscellaneous "outbuildings." *See* Exhibit BA 14, pg. V. Mr. Bott considered what the "highest and best use" of the Property is in calculating the value. Mr. Bott performed an analysis

---

**3.** All Exhibits were entered into evidence at the conclusion of the August Hearing.

**4.** The Motion for Relief alleged that the Debtor borrowed an additional $200,000 from BOA. *See* Motion, pg. 3. However, the Bank was unable to prove at the August Hearing that payment was due on this loan. Therefore, the Court will not consider this alleged debt as a lien on the Property.

**5.** Mr. Cataldo testified that he has filed for Chapter 7 bankruptcy.

of the flood plain and the lot width and determined that there are seven lots for vacant land. According to Mr. Bott, the Property contains 27.4 acres of developable land, 9.5 of which are in a flood plain.

Currently, the Property is zoned as "R–IA, Residential," which requires a two acre minimum lot size. Each of the seven two acre plots are worth approximately $155,000, according to Mr. Bott.[6] Mr. Bott conceded that it would be possible to obtain "cluster zoning"—which requires only a one acre minimum lot size—on the Property, but noted that cluster zoning may mean that the each plot of land is worth around 15–20% less than it would be otherwise. In addition, converting the Property to cluster zoning, according to the testimony of Mr. Bott, would require both 45% more open land space and the extension of public water and sewer lines. These requirements would mean that the conversion from R–IA to cluster zoning, according to Mr. Bott, would produce only one additional lot of land and yet cost a great deal of additional time, money, and work.

Mr. Bott therefore said that he considers the R–IA zoning—maintaining the seven, two acre plots—to be the most profitable use of the Property because of the additional value of using the larger size lots and the efficiency of working with the land as it is, rather than assuming the costs and risks of additional water, sewer, and road projects. *See* Exhibit BA 14 at pg. 25 ("the ... R–1A Zoning ... would preserve the flood plain and other resource protected areas of the site ... the subject

may have the potential for one additional home site [under Cluster zoning], but with significantly higher development cost related to contracting for and extending public water and sewer to the site."). Mr. Bott said that his estimates assume that the Property will take about a year to market and sell and that this is a reasonable "exposure time" in the market.[7] Mr. Bott did concede that if the Debtor obtained approvals to subdivide the Property, the value of the Property would likely increase. It is possible that these approvals could be obtained within a year.

Robert Showalter, an expert civil engineer with almost 40 years of experience, testified regarding both the use of the Property for the Debtor and how use of the land may ultimately be valued by a potential purchaser of the Property. Mr. Showalter is not an appraiser, though he has testified previously regarding property valuations. Mr. Showalter, who was initially hired on this project by Mr. Ripley and Mr. Cataldo three years ago, is familiar with the Property and its zoning. He has performed flood plain, wetland, impact, and traffic analyses, which he deems critical to determining the amount of land that is available for development. Mr. Showalter prepared plans in preparation for the McKee Agreement of Sale (which, as described above, ultimately fell through).

Mr. Showalter testified that the Property (not including the Cataldo Property) is worth approximately $4,000,000, or $2,860,000 when one deducts the necessary improvement and engineering costs.[8] The

---

6. Seven lots at $155,000 each equals $1,085,000. The barn and additional "outbuildings" are valued at a total of $750,000, bringing the total value of the Property to $1,835,000. *See* Exhibit BA 14, preface, pg. 3.

7. "Exposure time" is defined in Mr. Bott's appraisal report to mean "the length of time

the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at the market value on the effective appraisal date ..." Exhibit BOA 14, pg. 3.

8. There will also be certain (unspecified) costs for obtaining approvals on the Property. However, Mr. Showalter testified that the

exhibit provided by Mr. Showalter shows $2,860,000 to be the "net value" of the Property. *See* Exhibit D9, pg. 2. The total figure of approximately four million is calculated in the following way (*see Id.*):

| Lot | Value | Notes |
|---|---|---|
| Historical Farm House | $ 650,000 | |
| Barn Lot | $ 450,000 | |
| Nine Lots at $275,000 per lot | $2,250,000 | • This is the "Improved Lot Value"<br>• Mr. Showalter calculates 9 times $275,000 to be $2,250,000; the Court calculates it to be $2,475,000. |
| Two additional lots at $325,000 | $ 650,000 | |
| **TOTAL** | $4,000,000 | |

Mr. Showalter estimates that the total improvement and engineering costs would be $1,140,000. He arrives at this figure by calculating that each of the 13 lots would cost approximately $80,000 to improve— for a total of $1,040,000—and that the engineering costs would be about $100,000. *See* Exhibit D9 at pg. 2.

Mr. Showalter directed the Court to his current sketch plan, Exhibit D9, which calls for the Property to be divided into 13 lots of at least one acre, allowing for 45% of the land as open space under a B7 single-family cluster zoning. Of these 13 lots, 11 would be new lots, one lot would contain the existing historical farmhouse and an area of 1.4 acres, and one lot would contain the existing historical barn with an area of 1.68 acres. *See* Exhibit D9 at pg. 1. The other 11 lots would vary in size from one acre to 1.47 acres. *Id.* According to Mr. Showalter, this design would have many benefits, including preserving the Neshaminy stream and walking trail, which are important to the Township. Also, Mr. Showalter emphasized that the "D9 Plan," as he called it, is the simplest and fastest one to accomplish because it will receive approval "by right," which

means that because it meets the requirements for zoning and construction, the D9 Plan will necessarily receive zoning approval and there will be no need for additional hearings, which would add time and potentially cost to the project. Further, while this analysis and pricing does not specifically take the Cataldo Property into account, Mr. Showalter noted that this type of zoning and planning would work well for the Cataldo Property. Therefore, a buyer who is interested in purchasing both the Ripleys' and the Cataldos' properties could incorporate the D9 Plan into his or her purchase.[9]

Even though approvals with regard to the D9 plan are "by right," they still need authority; the needed stamps of approval can take anywhere from six months to a year and a half to obtain. However, Mr. Showalter testified that the necessary groundwork on this project has been done. In addition, the Property is far more valuable as an approved development plan than as a mere undeveloped piece of land.

While Mr. Showalter did recommend the "D9 Plan" as the fastest and simplest way of marketing and selling the Property, he also noted that a substantial amount of due

costs of obtaining such approvals will be paid by any developer who purchases the Property.

9. Mr. Showalter noted that the Cataldo Property could potentially add additional lots to the development and does not have the same resource restrictions as the Ripley property.

diligence has been performed with regard to the "B15" historical preservation cluster zoning option (the "B15 Option"), if a developer should choose to go that route. The B15 Option was initially developed for the McKee Group. It called for a development of townhouses and had the added benefit of preserving a 500 or so year-old tree that is beloved by the Township. Mr. Showalter offered that he considers the B15 Option ultimately to be the best use of this Property. However, the B15 Option does not have "by right" approval; it is a conditional use approval, which requires additional hearings and thus would cost additional time and possibly money to the project.

### The Liquidating Plan of Reorganization

At the August Hearing, Mr. Ripley submitted for consideration a Liquidating Plan of Reorganization (the "Plan"). *See* Exhibit D1. Since the hearing, a plan substantially similar to the one provided at the August Hearing has been filed in Mr. Ripley's bankruptcy case. Docket entry no. 65, filed September 3, 2008. The Plan calls for the sale of the Property to take place within one year from the date of the filing of the Plan, and in no event later than September 1, 2009. Exhibit D1 at pg. 16; docket no. 65 at pg. 15. The Plan further provides:

> If the Debtor does not obtain a binding agreement of sale for the [Property] by July 16, 2009, the [Property] will immediately be listed with a real estate auctioneer who will advertise and market the real estate for an auction to take place no later than September 16, 2009. If the Debtor obtains an agreement of sale for the [Property] by July 16, 2009, but the buyer does not close by September 1, 2009, the [Property] will immediately be listed with an auctioneer as set forth above with the auction to take place no later than sixty (60) days after

such listing. If a sale is not consummated as outlined above, the [Property] will be auctioned and all proceeds will be used to satisfy the allowed claims. To the extent the auction does not yield enough money to satisfy all claims in full, the creditors will share pro-rata in the distribution.

*Id.* The Debtor also filed a Disclosure Statement and Motion to Approve the Disclosure Statement on September 3, 2008. *See* docket entry nos. 66, 67, 72, and 73.

## II. STANDARDS FOR LIFTING THE AUTOMATIC STAY

■ The automatic stay is "one of the fundamental debtor protections supplied by the Bankruptcy Code." *In re Atlantic Med. Mgmt. Servs., Inc.*, 387 B.R. 654, 662 (Bankr.E.D.Pa.2008) *(citing University Medical Center v. Sullivan (In re University Medical Center),* 973 F.2d 1065, 1074 (3d Cir.1992)). *See also In re Ellis,* 339 B.R. 136, 140 n. 7 (Bankr.E.D.Pa.2006) (noting that the automatic stay gives the debtor "a breathing spell from his creditors by stopping all collection efforts, all harassment and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan or simply to be free of the financial pressures that drove him into bankruptcy."). Specifically, Section 362(a)(3) of the Code stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Further, Section 362(a)(4) stays "any act to create, perfect, or enforce any lien against property of the estate."

■ A court may lift the automatic stay "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . (2) with respect to a stay of an act against property under subsection (a) of this section, if-(A) the debtor does not have an equity in such

property; *and* (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2) (emphasis added). Whether to terminate or modify the bankruptcy stay under section 362(d) is within the discretion of the bankruptcy court and is a determination made by examining the totality of the circumstances. *In re Milstein,* 304 B.R. 208, 211 (Bankr.E.D.Pa. 2004) (citations omitted). *See also In re Rambo,* 2004 WL 231011, at *2 (Bankr. E.D.Pa. Jan.29, 2004). The party requesting relief from the automatic stay has the burden of proof with regard to the issue of the debtor's equity, and the party opposing such relief has the burden of proof that the property is necessary to an effective reorganization. *Nazareth Nat'l Bank v. Trina–Dee, Inc.,* 731 F.2d 170, 171 (3d Cir. 1984); 11 U.S.C. § 362(g)(1–2).

■ A debtor lacks equity in property for purposes of section 362(d)(2) when "the debts secured by liens on the property exceed the value of the property." 3 *Collier on Bankruptcy,* ¶ 362.07[4][a] at 362-98 (15th ed.2002). In other words, in making a determination on equity, a court "focuses on a comparison between the *total* liens against the property and the property's current value ... *all* encumbrances are totaled to determine equity whether or not all lienholders have requested relief from the stay." *In re Indian Palms Assoc., Ltd.,* 61 F.3d 197 (3d Cir.1995) (emphasis added). *See also Sutton v. Bank One, Texas, N.A.,* 904 F.2d 327 (5th Cir. 1990); *Stewart v. Gurley,* 745 F.2d 1194, 1195 (9th Cir.1984).[10]

■ If the movant demonstrates that the debtor has no equity in the property, then the debtor has the opportunity to prevent modification of the automatic stay by showing the court that the property is necessary for an effective reorganization. *See In re Epic Capital Corp.,* 290 B.R. 514, 520 (Bankr.D.Del.2003). The Supreme Court has outlined the standard necessary for demonstrating whether property is necessary for an effective reorganization:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in the* prospect. This means ... that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*United Savings Assoc. of Texas v. Timbers of Inwood Forest,* 484 U.S. 365, 376–77, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (emphasis in original). According to the Third Circuit, the debtor must show that "a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed." *John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Assoc.,* 987 F.2d 154, 157 (3d Cir.1993). As one court noted "[w]hile the debtor need not demonstrate that substantial consummation of its plan is guaranteed, a reasonable possibility of a successful reorganization cannot be founded solely on speculation." *In re Dupell,* 235 B.R. 783, 790 (Bankr.E.D.Pa.1990) (citation omitted). *See also Laddeck v. Laddeck,* 2001 WL 423026, at *8 (Bankr.E.D.Pa. Apr.11, 2001). Proposed plans must be viable to be confirmed in order to prevent the "confirmation of visionary schemes." *In re American Sweeteners, Inc.,* 1999 WL 1068446, at *3 (Bankr.E.D.Pa. Nov.22, 1999) (*citing 5 Collier on Bankruptcy,* ¶ 1129.02[11] at 1129–59 (15th ed.1994)).

10. The Bank was thus incorrect when it asserted at the August Hearing that the equity determination in this matter should be made simply by comparing the current value of the Property to the amount of BOA's lien on the Property.

The question presented by the Bank's Motion is therefore twofold. First, does Mr. Ripley have equity in the Property? Second, is the Property necessary for an effective reorganization? If the answer to either question is yes, the Motion must be denied. The questions will be taken in turn.

### III. VALUATION

■ The first question can be answered in the negative. The Court concludes that—given the many secured creditors with claims against it—the Debtor does not at this time have equity in the Property. While the Court finds that making a specific dollar valuation regarding the Property to be difficult, if not impossible, at this point,[11] such a determination is also unnecessary, for the Debtor's calculation of equity fails on its own merits.

As discussed above, in order to calculate a debtor's equity in his property, a court must determine the current market value and then subtract *all* encumbrances on the property (as opposed to just the lien the secured creditor who holds a first mortgage). *See In re Indian Palms Assoc., Ltd.*, 61 F.3d 197 (3d Cir.1995). In this case, the amount of secured debt on the Property totals $3,531,542 (the "Total Secured Debt").[12] Mr. Showalter—the Debtor's own witness—testified that the Property would be worth $4,000,000 only after $1,140,000 was spent on engineering and improving. While Mr. Showalter indicated at the August Hearing that the costs of improving the Property may be paid by a developer rather than by the Debtor, both his testimony and his written report make clear that the "net value" of the Property—i.e. the value of the Property to the Debtor and his estate—is $2,860,000. Exhibit D9, pg. 2. In other words, Mr. Showalter estimates that the current market value of the Property at this time is $2,860,000, which is substantially less than the $3,531,542 the Debtor currently owes on the Property.[13] For this reason, the Court determines that Mr. Ripley lacks equity in the Property. *See California Diesel & Equipment, Inc. v. Sun Exploration and Production Co.*, 990 F.2d 1256, 1993 WL 77276 (9th Cir. Mar.18, 1993) (holding that costs to improve property were necessarily sellers costs and would not be imposed on the buyer of property); *In re River Valley Fitness One Ltd. P'ship*, 2006 WL 618442, at *15 (Bankr. D.N.H. Mar.7, 2006) (reducing valuation analysis by cost of improvements); *In re Zeigler*, 320 B.R. 362, 379 (Bankr.N.D.Ill. 2005) (same).

11. The value of the Property is a very difficult question, particularly where, as here, two skilled professionals have reached different conclusions regarding valuation. *See, e.g. In re Prussia Assoc.*, 322 B.R. 572, 580 (Bankr. E.D.Pa.2005) (quoting the "oft noted proposition that the appraisal of real estate is an inexact science.").

12. This figure is derived by adding the following amounts: the current payoff amounts on the $950,000 Loan and the $400,000 Loan, *see* Exhibits BOA 9 and BOA 10, ($1,306,483 and $487,690, respectively), plus the Real Estate Taxes of $5,963, plus the $531,406 owed to Madison, plus the $1,200,000 owed to Ohio Casualty. *See* Amended Schedule D, docket no. 64. Note that the amount found to be owed to the Bank at trial ($1,794,173: $1,306,483 owed on the $950 Loan plus $487,690 owed on the $400,000 Loan) is higher than the amount that the Debtor lists as a debt to the Bank on Amended Schedule D ($1,781,229) and thus the Court's calculation of the Total Secured Debt at $3,531,542 is higher than that asserted by the Debtor, which is $3,518,599. *See* Amended Schedule D.

13. There is no question that the Debtor lacks equity in the Property if one accepts the conclusion of Mr. Bott, who testified that the Property is currently worth $1,835,000. This figure is far less than the $3,531,542 that the Debtor owes to his secured creditors.

The Court must deduct the value of planned improvements and assess the Property as is because "[p]roperty to be assessed, whatever may be its character, is to be taken and valued in the actual condition in which the owner holds it." *In re Mocco*, 222 B.R. 440, 462 (Bankr.D.N.J. 1998) (citations omitted). Mr. Schowalter's figure of $2,860,000—the value of the Property without improvements—simply does not come close to giving Mr. Ripley equity in the Property, given that he owes his secured creditors $3,531,542 at this time. The Court therefore finds that the Debtor lacks equity in the Property. Part two of the test for whether to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(2) must therefore be examined.

## IV. REORGANIZATION

■ Despite the Court's conclusion that Mr. Ripley lacks equity in the Property, the stay will not be lifted at this early stage in the Debtor's bankruptcy because the Property is necessary for an effective reorganization pursuant to 11 U.S.C. § 362(d)(2). Mr. Ripley presented at the August Hearing, and has since filed, what this Court considers to be a potentially viable bankruptcy plan (the "Plan"). The Plan, as more fully detailed above (*see* Section I, pg. 12–13) calls for selling the Property and distributing the proceeds to the secured creditors. The Plan calls for obtaining a binding agreement of sale on the Property by July 16, 2009. As a preliminary matter, it is clear that the Property is necessary to effectuate the Plan; the Property is Mr. Ripley's sole valuable asset and the one which is secured by his four primary creditors. *See In re Indian Palms Assoc., Ltd.*, 61 F.3d 197, 209 (3d Cir.1995) ("[i]n a single asset bankruptcy case ... the property will almost always be necessary for reorganization for the

very reason that it is the debtor's sole asset, and relief under 362(d)(2)(B) will be available only if the bankruptcy court concludes that reorganization within a reasonable time is not feasible").

Thus, the question becomes whether the Plan is viable. The Bank contends that the Plan and this case are "going nowhere" and should be cut off sooner rather than later in order to pay the secured creditors in the most timely way possible. Mr. Ripley, on the other hand, argues that he is on the cusp of getting necessary building approvals for the Property. When these are obtained, the Debtor asserts, the value of the Property will increase greatly. Thus, according to the Debtor, there is a benefit to selling the Property in an organized, timely way and marketing it carefully, rather than selling the land in a rushed manner out of bankruptcy. The former, contends Mr. Ripley, will create more value for secured creditors and means that the Plan is confirmable.

Here, the Court agrees with the Debtor. The Plan appears at this early stage to be viable. If there is one thing that everyone agreed on at the August Hearing it is that the Property is in a desirable, central location and that the land can and will ultimately be developed. *See* Appraisal Report of Mr. Bott, Exhibit BA 14, at pg. 7 ("the subject is located in one of Philadelphia's most desirable suburban communities. Its proximity to regional highways and employment centers, residential amenities, and highly regarded public school system have made and should continue to make Doylestown Township a premier residential market."). Thus, there seems to be no reason to rush to sell the Property, particularly in the current volatile real estate market.[14] The Debtor and

14. Due to the current downturn in the real estate market, lifting the stay at this point

Mr. Showalter have done a great deal of work researching and planning how best to develop the Property. It would be a waste not to see that labor come to fruition by allowing these parties to attempt to market this Property in the way that they deem to be most fitting and profitable. Lifting the stay at this point could potentially eradicate much of the work that has been done with regard to the development of the Property up to now.

In fact, Ohio Casualty, which is owed $1.2 million by the Debtor and is third in line to get paid (behind BOA and Madison), argues that, at a minimum, there will be equity in the Property by the time the Debtor intends to sell it in a year and, therefore, that Mr. Ripley should be given a chance to reorganize. *See* Response to the Motion for Relief, docket entry no. 29. (Counsel for Ohio Casualty also appeared at the August Hearing to argue against lifting the automatic stay.) In other words, one of the Debtor's secured creditors is expending significant funds to stave off stay relief and allow the Debtor to market the Property because it believes it will be worth more if the Debtor is allowed to complete his development and marketing plans for this land. And, as Ohio Casualty's Response point's out, because Ohio Casualty and Madison Bank's mortgages are cross-collateralized on the Cataldo Property, "Mr. Ripley and Mr. Cataldo may intend to coordinate the sales of their respective contiguous properties in order to maximize the development potential thereof." (Ohio Casualty Response, ¶ 7). As previously discussed, such a plan could well also add to the value of the Property.

In addition, the Debtor's Plan calls for the Property to be marketed and sold within less than a year. The Plan lays out specific contingency arrangements for what will happen if an agreement of sale is not signed by July 16, 2009. This, the Court finds, means that there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Savings Assoc. of Texas v.* Timbers of Inwood Forest, 484 U.S. 365, 376, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The Debtor has satisfied the Court that "a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed." *John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154, 157 (3d Cir.1993).

The Court's reluctance to lifting the stay also stems from the fact that Mr. Ripley's case was filed about six months ago and he was able to retain counsel just four months ago. *See* docket entry no. 37. It is simply too soon to declare that the Debtor has no chance of proceeding successfully with his bankruptcy remedies and that BOA should therefore be allowed to pursue its rights in state court. *See In re Dupell,* 235 B.R. 783, 795 (Bankr.E.D.Pa.1999) ("[a] bankruptcy court should be reluctant to deprive a debtor of the benefits of Chapter 11 relief before it has an adequate opportunity to utilize its rehabilitative features"); *In re American Sweeteners, Inc.,* 1999 WL 1068446, at *3 (Bankr.E.D.Pa. Nov.22, 1999) (same). Further, it is unlikely, or at least unclear, that the Bank would receive payment on its debt any faster if the stay were lifted. Mr. Bott testified for the Bank that it would take a year to market and sell the Property. Similarly, the Plan proposed by the Debtor calls for there to be an agreement of sale in place by July 2009. In either case, the Bank would not receive payment until at least next summer. Thus, not only is it premature at this point to lift the stay, but it does not

could provide the Bank with the windfall if it were to purchase the Property now at a discount and sell it in a year or so at a significant profit.

appear that doing so would have the intended effect of getting the movant more immediate payment on its secured debt.

■■■ The Bank also erroneously assumes that the Debtor's lack of equity in the Property necessarily means that his Plan is not feasible. This is not so for at least three reasons. First, if lack of equity meant that a plan of reorganization would necessary fail, the test outlined in 11 U.S.C. § 362(d) would not be a two-part test. Second, other courts have denied a motion to lift the stay under similar factual circumstances, holding that a debtor who lacks equity in property may still need the property for an effective reorganization. *See, e.g., In re Epic Capital Corp.*, 290 B.R. 514, 520 (Bankr.D.Del.2003) ("even if there is no equity, a debtor need only establish though *prima facie* evidence that the collateral will likely play a significant role in the reorganization.") (citation omitted). *See also* In re Dupell, 235 B.R. 783, 795 (Bankr.E.D.Pa.1999) (refusing to lift the stay and allowing the debtor a chance to file and pursue a plan of reorganization despite there being no equity in the property). Third, the Debtor adequately explained at the August Hearing how the marketing and sale of the Property is feasible. Given the extensive amount of planning work that has already been done with regard to the Property, and the fact that the cost of approvals will be paid by a prospective developer, the Court concludes that the Debtor's Plan to market and sell the Property within a year—despite the fact that he currently has no equity in the Property—is in fact feasible.[15]

## V. CONCLUSION

For reasons discussed above, the Court concludes that it is premature and unwarranted to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(2) at this time. Therefore, the Motion is denied. While the Debtor lacks equity in the Property, the land is necessary for an effective reorganization. The Debtor has presented the Court with a plan of reorganization which the Court deems to be viable. It is reasonable to propose that the Property can be marketed and sold within approximately one year.

---

**15.** While the Motion did not seek adequate protection and this subject was not dealt with at any length at the August Hearing, the Court notes that lack of adequate protection can, under certain conditions, be a basis for lifting the stay. *See* 11 U.S.C. § 362(d)(1), (noting that the stay may be lifted "for cause, including the lack of adequate protection of an interest in property"). It is not disputed that Mr. Ripley is not currently making payments to BOA on his loans. However, adequate protection may be provided in a variety of ways, including by the creation of a "viable plan of reorganization which meets the debtor's statutory obligations to the secured creditor." *In re American Sweeteners, Inc.*, 1999 WL 1068446, at *2 (Bankr.E.D.Pa. Nov.22, 1999) (citation omitted). *See also In re Dupell*, 235 B.R. 783, 789 n. 10 (Bankr.E.D.Pa. 1999) (citation omitted). Thus, because the issue of adequate protection has not been properly raised by BOA and because the Debtor appears to be providing the Bank adequate protection by having proposed a viable plan of reorganization, the Court will not order an additional hearing to be held on adequate protection at this time.